IN RE JAZMINE B.*
(AC 30390)

Bishop, Beach and Schaller, Js.

Argued February 2—officially released May 25, 2010

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Michael S. Taylor*, with whom were *Brendon P. Levesque* and *Robert W. Shaver II*, for the appellant (respondent father).

*Benjamin Zivyon*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Opinion*

BEACH, J. The respondent father[1] appeals from the judgment of the trial court terminating his parental rights with respect to his minor daughter, Jazmine B.[2] On appeal, the respondent claims that the court (1) erroneously found that he had failed to achieve a sufficient degree of personal rehabilitation within the meaning of General Statutes § 17a-112 (j) (3) (B) and (2) improperly terminated his parental rights because § 17a-112 (j) (3) (B) is unconstitutionally vague as applied to him. We affirm the judgment of the trial court.

The following facts and procedural history are relevant. Jazmine was born on March 27, 2001. When she

---

[1] The respondent mother has not appealed from the trial court's judgment terminating her parental rights. We refer in this opinion to the respondent father as the respondent.

[2] The court's memorandum of decision spells the child's name as "Jazmine," but the various pleadings and exhibits admitted into evidence during the trial include variations of the child's name such as "Jasmin," "Jazmin" and "Jasmine."

was three days old, Jazmine was placed into the custody of the petitioner, the commissioner of children and families, pursuant to an ex parte order of temporary custody, on the basis of her mother's eviction from her residence, history of domestic violence and physical neglect of her other children. At the time of Jazmine's birth, the identity of her biological father was unknown.

Following the order of temporary custody, Jazmine was placed in the home of Ana C., a licensed foster parent with the department of children and families (department). Jazmine was returned to her mother's care under an order of protective supervision on October 29, 2001. Due to her mother's failure to comply with court-ordered specific steps to bring about reunification with Jazmine[3] and the mother's lack of a permanent residence, Jazmine was subsequently returned to the care of the petitioner in April, 2002, and was placed into her previous foster home. At the time of trial, Jazmine had been living in the same foster home for seven years.

In 2001, the respondent's paternity was confirmed by the results of a court-ordered genetic test. His whereabouts then became unknown. The respondent was arrested and charged with threatening on September 12, 2001, and convicted of that charge on December 14, 2001. He was sentenced to time served.

The respondent has an extensive criminal history. In addition to numerous traffic violations, he has been convicted of manslaughter, threatening, assault, failure to appear and risk of injury to a child.[4] He was first

---

[3] See General Statutes § 46b-129 (j).

[4] The respondent was originally charged on September 2, 1995, with sexual assault in the fourth degree and risk of injury to a child. The charges arose from an incident in which an eleven year old victim, the grandchild of the woman with whom the respondent was residing, accused the respondent of sexually molesting her while she was in his care. When asked about the allegation, the respondent claimed that he only "grabbed her between her legs and flipped her over on the couch a few times but he didn't mean to

referred to services in July, 2001, when agents of the department referred the respondent to parenting classes. He did not attend those parenting classes until April 8, 2003, and he subsequently completed the program on June 19, 2003. On July 14, 2003, the respondent filed a motion to revoke the commitment. The court ordered the respondent to participate in a psychological examination with Julia Ramos Grenier, a licensed psychologist. She expressed concern over the respondent's prior conviction of risk of injury to a child and opined that the respondent would not be able to resume a responsible position in Jazmine's life and that it therefore was in Jazmine's best interest to stay with her foster family.

On May 13, 2004, the court held a hearing regarding how to proceed with respect to the respondent's parental rights. Despite Grenier's recommendation that Jazmine not be reunified with the respondent, the court ordered specific steps toward reunification for the respondent. Recognizing his completion of these specific steps, the department, in its September 2, 2004 study in support of a permanency plan and to maintain commitment, noted that "it is appropriate to make reasonable efforts to reunify the child with [the respondent]." In July, 2004, the court found that visits between the respondent and Jazmine were going well and stated that the plan was to reunify the two by December, 2004. By October, 2004, all parties agreed to increase the length of visits. The petitioner sought to increase visits to two full daytime visits and then overnight visits.

Overnight visits began on November 22, 2004. Part of the first visit was supervised by Tracy Long, a clinician with the department. Long stayed through Jazmine's bath time. Her testimony was not entirely clear,

be touching her sexually or anything except playfully." The respondent subsequently pleaded guilty to the charge of risk of injury to a child.

but Long recorded in her notes that "[i]nitially, [the respondent] was uncomfortable with [Jazmine] taking off her underwear and wanted her to take a bath with them on." Jazmine refused to leave her underwear on, and Long told the respondent that it would be permissible for her to remove her underwear, as the clinician was there. The remainder of the overnight visit went well.

A second overnight visit occurred on November 29, 2004. Long was present during the beginning of this visit but wrote in her notes that she "did not stay to witness [the respondent] give [Jazmine] her evening bath [because she] did not have any reservations in allowing [the respondent] to conduct the bath without this clinician being present." When Jazmine returned to her foster home the following day, she disclosed to her foster mother and to a friend that the respondent had "put his . . . finger in my toti."[5]

On December 2, 2004, Jazmine was examined by a pediatric nurse practitioner and a forensic medical examiner trained in child abuse matters, Judy Kantz. Jazmine repeated her allegation to Kantz. Jazmine had a normal vaginal examination, but Kantz also reported that she did not find the medical examination to be inconsistent with Jazmine's allegation, nor did she see signs of coaching, which she was trained to detect. A forensic interview also was conducted, but it was not completed because Jazmine became upset.

As a result of Jazmine's allegation and her changed demeanor toward the respondent,[6] visits with the respondent were suspended. The petitioner filed a

[5] Jazmine used the word "toti" to refer to her vagina.

[6] Shortly after the alleged incident, Jazmine began referring to the respondent as a "bad boy" and a "monster." She indicated that she did not want to visit with him again and became very upset when she was taken to the department's office, which is located across the street from the respondent's residence.

motion to cease visits on December 21, 2004. The respondent then filed a second motion to revoke the commitment on January 27, 2005. Those motions were consolidated with the petitioner's motion to maintain the commitment, which had been filed on October 8, 2004. A trial on the consolidated motions was held on January 28, February 4 and April 28, 2005. On June 2, 2005, the court issued its decision denying the respondent's motion to revoke the commitment, ordering that the respondent's visits be supervised rather than suspended and ordering that the commitment be maintained.[7]

On September 20, 2005, the petitioner filed a petition for the termination of the respondent's and the mother's parental rights. The petitioner alleged two grounds for termination of the respondent's parental rights. First, the petitioner alleged that the respondent, by reason of his act or acts of commission or omission, had denied Jazmine the care, guidance or control necessary for her educational, moral or emotional well-being, pursuant to § 17a-112 (j) (3) (C), as a result of Jazmine's allegation that he had sexually abused her.[8] Second, the petitioner alleged that the respondent had failed to achieve sufficient rehabilitation pursuant to § 17a-112 (j) (3) (B) (ii).[9]

---

[7] The Waterbury police department declined to pursue charges against the respondent because Jazmine was unable to participate in the forensic interview, and the respondent passed a polygraph test in which he was asked a number of questions about the claim of sexual molestation by Jazmine. The department also found insufficient evidence to substantiate Jazmine's allegation and subsequently closed its investigation.

[8] General Statutes § 17a-112 (j) (3) (C) provides for the termination of parental rights of a child when "the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being, except that nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights . . . ."

[9] General Statutes § 17a-112 (j) (3) (B) (ii) provides for the termination of parental rights of a child when the child "is found to be neglected or

The court determined that the petitioner had failed to meet its burden of proof on the ground of omission or commission, pursuant to § 17a-112 (j) (3) (C), but had met its burden of proof as to the ground that the respondent had failed to achieve sufficient rehabilitation, pursuant to § 17a-112 (j) (3) (B) (ii). In a written decision filed August 29, 2008, the court, *Kahn, J.*, terminated the respondent's parental rights.[10] This appeal from the termination of the respondent's parental rights followed.

I

The respondent first claims that the court's finding that he failed to achieve the degree of personal rehabilitation required under § 17a-112 (j) (3) (B) (ii) was clearly erroneous. Because the record supports the court's finding, this claim fails.

We first turn to the standard of review that governs this claim. "A trial court's finding that a parent has failed to achieve sufficient rehabilitation will not be

uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[10] The court stated: "While [the respondent] ultimately completed parenting classes, his repeated failure to engage in individual therapy and/or sexual offender treatment to enable him to reunify with [Jazmine] gives the court little confidence that he will be in a position to address the emotional and physical needs of his child. . . . [E]ven assuming no sexual misconduct occurred, [the respondent] should engage in therapy to be able to understand and address whatever he has done that caused [Jazmine] to feel uncomfortable or [what] he might inadvertently do to cause such uncomfortable feelings. Further, [the respondent's] prior plea and conviction for risk of injury to a minor involving an incident of alleged sexual misconduct [of] an eleven year old child (even if later retracted, as claimed by [the respondent]) supports a finding that [the respondent] might benefit from sexual offender treatment." (Internal quotation marks omitted.)

overturned unless it is clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . .

"On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling. . . .

"In order to terminate a parent's parental rights under § 17a-112, the petitioner is required to prove, by clear and convincing evidence, that: (1) the department has made reasonable efforts to reunify the family; General Statutes § 17a-112 (j) (1); (2) termination is in the best interest of the child; General Statutes § 17a-112 (j) (2); and (3) there exists any one of the seven grounds for termination delineated in § 17a-112 (j) (3)." (Citation omitted; internal quotation marks omitted.) *In re Melody L.*, 290 Conn. 131, 148–49, 962 A.2d 81 (2009).

"Personal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available

support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Internal quotation marks omitted.) *In re Trevon G.*, 109 Conn. App. 782, 789, 952 A.2d 1280 (2008).

The respondent argues that the only basis for the court's finding that he failed to obtain sufficient rehabilitation was his refusal to participate in either sexual offender treatment or individual therapy. He contends that this finding is insufficient because (1) the evaluation on which the court and the petitioner relied did not expressly refer him to those services, (2) sexual offender treatment was inappropriate because the allegation of sexual abuse was unsubstantiated by the court and the department, and he denied any wrongdoing, (3) the department failed to refer him for individual therapy and (4) he substantially complied with all of the department's recommendations. We are not persuaded.

In its memorandum of decision, the court determined from the evidence introduced at trial, that the petitioner did not establish by clear and convincing evidence that the respondent sexually molested Jazmine. It did find, however, that "[w]hile [the respondent] ultimately completed parenting classes, his repeated failure to engage in individual therapy and/or sexual offender treatment to enable him to reunify with [Jazmine] gives the court little confidence that he will be in a position to address the emotional and physical needs of his child." The court concluded that the respondent's "need for these services [was] particularly critical given [his] limited contact with Jazmine throughout her life and his lack of experience in caring for any of his children, much less a child as young as Jazmine." The court therefore

concluded that the respondent had not achieved reha-
bilitation to a level that would encourage a belief that
he could assume a responsible position in Jazmine's life.

The court's finding that the respondent had not suffi-
ciently achieved rehabilitation is supported by the
record before us. At trial, a court-ordered evaluation
dated April 17, 2006, and performed by William F. Hob-
son, an expert in the treatment and risk assessment of
sex offenders and sexual abusers was introduced into
evidence. The purpose of the evaluation was to answer
questions provided by the court as well as to provide
an overall risk assessment of the likelihood that the
respondent would sexually offend again. Hobson stated
in his evaluation that it was difficult to assess the
respondent's risk of reoffending due to the significant
discrepancies between the information contained in the
documents offered by the court and the version of the
same events provided by the respondent. On the basis
of the information provided by the respondent as well
as the information contained in the court documents,
Hobson recommended in his report that the respondent
not be allowed unsupervised conduct with Jazmine
because of "both the unresolved allegations of sexual
abuse but also his admitted poor judgment and failure
to comply with [the department's] rules governing their
contact during their first overnight visit with his daugh-
ter." Hobson further stated that the respondent
"appears to demonstrate a pattern of making poor deci-
sions while deflecting responsibility for his actions"
and that his behavior suggested a tendency to attempt
to deceive authorities and to act impulsively to meet
his own emotional needs. With regard to counseling,
Hobson recommended that both Jazmine and the
respondent participate in therapy, both individually and
then together, prior to any visitation taking place. He
also suggested that if the respondent had sexually

abused Jazmine, he should participate in specialized treatment.

Hobson also testified at trial. He stated that his concern about the respondent's poor judgment and failure to comply with the department's rules was based on the respondent's decision to pick up Jazmine's mother and bring her to his apartment, an action which was not authorized by the department. Hobson also described the discussion with the respondent regarding his past criminal behavior and characterized the respondent's articulation of those events as "deflecting responsibility." He further expressed a concern that the respondent could model this negative behavior for Jazmine, which behavior would not be helpful to her.

Also introduced into evidence was the report of the psychological evaluation ordered by the court and performed by Bruce Freedman, a clinical psychologist. That report stated that the respondent "showed a pattern of personality and behavior problems, with a lifetime of failed, unstable relationships, aggressive and other types of behavior problems, and arrests for some of these." The report also noted that the respondent, "based upon his own accounts . . . had shown a number of instances of impulsive, aggressive behavior, some toward adults, other outbursts directed at children." The report enumerated many times that the respondent "showed poor qualifications to care for a young child," which conclusion was based not only on his conviction of risk of injury to a child and Jazmine's allegation of sexual abuse, but also on the behavior and personality problems stated previously. On the basis of these problems, as well as the fact that the respondent insisted that he was not guilty of sexual abuse as to either allegation, the report concluded that "it would be impossible to provide even a modest guarantee of the safety and well-being of any child placed with him in the foreseeable future." In answer to the question of

what kind of counseling or other services were recommended, the report stated that "[s]imply put, [the respondent] did not feel he had any psychological problems, so that counseling or other services would not be likely to be productive."

Freedman also testified at trial. He stated his conclusions as follows: "I believe that [the respondent] has psychological problems, which he is strongly inclined to deny. I believe that he has a history of serious behavior problems, impulsive, sometimes dangerous behavior. I believe that his record with four of his five children is best described as abandonment. I believe that, from everything I understand, that he did not show good parenting skills even during his unsupervised visit; that aside from being accused of touching his daughter, sexually, by her, he, during this [initial visit] by a man she was just getting familiar with, he felt the need to bathe her; that there were so many things that were inappropriate in his handling of children and his own adjustment in life that I did not think he was suitable as a caregiver."

It was not clearly erroneous for the court to find that the department was justified in referring the respondent to sexual offender treatment. Hobson clearly suggested that the respondent should attend therapy both with and without Jazmine to address the behavior he exhibited that had made her uncomfortable, regardless of whether he had actually sexually abused her. In addition, Freedman expressly reported that the respondent's denial of both allegations of sexual abuse caused serious concerns about the safety and well-being of a child in the respondent's care. Both Hobson and Freeman enumerated several personality characteristics and behavior problems of the respondent that they believed rendered him an inadequate parent. The court had ample evidence from which it could have concluded

that the department properly referred the respondent to sexual offender treatment.

The court also was presented with sufficient evidence from which it could conclude that the department referred the respondent to individual therapy. The court heard testimony from Cynthia Sevilla, a social worker with the department. In response to the court's question about whether there was any service or step that the department recommended but in which the respondent had refused to participate, Sevilla stated that she suggested that he attend individual counseling for himself. In response to this recommendation, the respondent stated that he did not believe that he needed individual counseling. Sevilla further stated that she was prepared to recommend places where he could attend individual counseling. Thus, the court had sufficient evidence before it to conclude that the department had begun the process of referring the respondent to individual counseling, which the respondent preemptively refused.

The respondent finally argues that because he substantially complied with the specific steps set forth by the court, it was improper for the court to determine that he had failed to achieve a sufficient degree of personal rehabilitation. The court considered the respondent's compliance with some of the department's recommendations and stated that "[i]n light of the facts of this case, completion of parenting classes alone does not establish rehabilitation." See *In re Coby C.*, 107 Conn. App. 395, 406, 945 A.2d 529 (2008) (rejecting claim that substantial compliance with specific steps bars court from terminating parental rights). We conclude that on the basis of the evidence before it, the court properly found that the petitioner had established, by clear and convincing evidence, that the respondent had failed to achieve sufficient personal rehabilitation as would encourage the belief that within a reasonable

time and considering the age and needs of the child, he could assume a responsible position in her life.

## II

The respondent also contends that § 17a-112 (j) (3) (B) is unconstitutionally vague as applied to him[11] because it fails to put a parent on notice that if he disagrees with a referral for sexual offender treatment and individual therapy, and consequently refuses to attend such treatment, that his parental rights could be terminated. We disagree and conclude that the statute and our case law provided more than sufficient guidance to the respondent.

"The void for vagueness doctrine is a procedural due process concept that originally was derived from the guarantees of due process contained in the fifth and fourteenth amendments to the United States constitution. . . . The doctrine requires statutes (1) to provide fair notice of the conduct they address and (2) to establish minimum guidelines to govern law enforcement. . . . [T]he minimum guidelines prong is applicable only where a statute is challenged as being unconstitutional on its face . . . ." (Citations omitted; internal quotation marks omitted.) *In re Shane P.*, 58 Conn. App. 244, 253, 754 A.2d 169 (2000). Because the respondent did not make a facial challenge to the statute, we concentrate on the first requirement.

The respondent acknowledges that his claim was not raised at trial but maintains that it should be reviewed under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Our Supreme Court held in *Golding* that a party can prevail on a claim of constitutional error not preserved at trial only if all of the following four conditions are met: "(1) the record is adequate to review

---

[11] The respondent stated in oral argument that he was not making a facial challenge to § 17a-112 (j) (3) (B).

the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id. We review the respondent's claim because the record is adequate and his claim is of a constitutional magnitude. We conclude that the respondent's claim fails to satisfy the third prong of *Golding*.

"Legislative enactments carry with them a strong presumption of constitutionality, and a party challenging the constitutionality of a validly enacted statute bears the weighty burden of proving unconstitutionality beyond a reasonable doubt. . . . In analyzing the constitutionality of a statute, the court will read the statute narrowly in order to save its constitutionality, rather than broadly in order to destroy it." (Citation omitted; internal quotation marks omitted.) *In re Shyliesh H.*, 56 Conn. App. 167, 178, 743 A.2d 165 (1999). "A statute is not unconstitutional merely because a person must inquire further as to the precise reach of its prohibitions, nor is it necessary that a statute list the exact conduct prohibited. . . . The constitution requires no more than a reasonable degree of certainty." (Citations omitted.) *Packer* v. *Board of Education*, 246 Conn. 89, 101, 717 A.2d 117 (1998).

The respondent argues that he was not put on notice because neither the specific steps nor the department specifically informed him that a failure to attend sexual offender treatment would cause the court to terminate his parental rights. This argument is not convincing. Our Supreme Court has stated that "[i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in

specific expectations ordered by the court or imposed by the department. . . . Accordingly, successful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation." (Internal quotation marks omitted.) *In re Melody L.*, supra, 290 Conn. 150–51.

The respondent received ample guidance so that he could appraise what was necessary to avoid a finding of failure to achieve sufficient personal rehabilitation. "Rehabilitate means to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. . . . Likewise, [f]ailure to rehabilitate is defined as the failure of a parent to achieve expectations following the adjudication and disposition of the prior neglect petition." (Citations omitted; internal quotation marks omitted.) *In re G.S.*, 117 Conn. App. 710, 722, 980 A.2d 935, cert. denied, 294 Conn. 919, 984 A.2d 67 (2009).

The department specifically referred the respondent to sexual offender treatment, and he refused to attend any counseling that did not include Jazmine as a direct participant. The referral was sufficient to put the respondent on notice that a failure to attend could result in the termination of his parental rights. Accordingly, we conclude that § 17a-112 (j) (3) (B) is not void for vagueness as applied to the respondent. The respondent has failed to meet the third *Golding* requirement that a clear constitutional violation exists, and his claim therefore must fail.

The judgment is affirmed.

In this opinion the other judges concurred.