IN RE JOCQUYCE C.*
(AC 31466)

DiPentima, C. J., and Alvord and Pellegrino, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 1—officially released October 26, 2010

*David B. Rozwaski*, for the appellant (respondent mother).

*Renee Bevacqua Bollier*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Opinion*

PELLEGRINO, J. The respondent mother[1] appeals from the judgment of the trial court terminating her parental rights with respect to her minor son, Jocquyce. On appeal, the respondent claims that the court improperly concluded that (1) she had failed to achieve a

---

[1] The respondent father has not appealed from the trial court's judgment terminating his parental rights. We refer in this opinion to the respondent mother as the respondent.

sufficient degree of personal rehabilitation within a reasonable period of time and (2) termination of her parental rights was in the best interest of the child. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our review of the respondent's claims. Although the respondent is the mother of two children, this appeal concerns her older child, Jocquyce, who was born in October, 2004. On August 18, 2006, the department of children and families (department) invoked a ninety-six hour administrative hold on behalf of the child. See General Statutes § 17a-101g. Thereafter, an order of temporary custody was issued by the court, *Conway, J.,* on August 22, 2006.[2] On September 21, 2006, Jocquyce was adjudicated neglected and committed to the custody of the petitioner, the commissioner of children and families. The respondent acknowledged specific steps to regain custody of her child that included her cooperation with the department, including home visits and all appointments. The respondent additionally agreed to participate in counseling, substance abuse evaluation and inpatient treatment, and that she would maintain adequate housing and income. She also agreed to avoid continued substance abuse and further involvement with the criminal justice system and to visit Jocquyce as permitted by the court.

Jocquyce initially was placed in a licensed foster home. On July 27, 2007, he was moved to a foster placement with his maternal aunt. On September 11, 2007, a termination of parental rights petition was filed to terminate the rights of both the respondent and the father. On July 25, 2008, Jocquyce was placed with his current, preadoptive foster family. On November 18,

---

[2] Also on that day, during a supervised visit, the respondent attempted to leave the department building with Jocquyce. She subsequently was apprehended by New Haven police and later pleaded guilty to custodial interference in the second degree in violation of General Statutes § 53a-98.

2008, and January 13 and April 1 and 29, 2009, a trial was held before the court, *Brown, J.*, regarding the petition as to Jocquyce. In its memorandum of decision filed August 27, 2009, the court made the following findings of fact.

The respondent was offered various services pertaining to parenting, housing, visitation, substance abuse and domestic violence. In late 2006, the department suspended the respondent's visitation due to an incident in which the respondent attempted to kidnap Jocquyce during a supervised visit. Also, in early 2007, due to the respondent's continued substance abuse and the recommendation of a court-ordered psychological evaluation, the department suspended the respondent's visitation until she had engaged in therapy and treatment.

The respondent's substance abuse was a primary issue of concern to the court. In November, 2006, the respondent engaged in therapy through ALSO-Cornerstone, but refused to follow the recommendation for inpatient treatment. Also in November, 2006, the respondent was referred to the Hospital of Saint Raphael's evening chemical dependency program. She refused to provide a hair sample or complete an evaluation, though she gave a urine sample that tested positive for cocaine and phencyclidine, commonly referred to as PCP. The respondent finally agreed to inpatient treatment in early 2007 at the Stonington Institute and was successfully discharged in February, 2007. Nonetheless, the respondent twice tested positive for cocaine and PCP in February, 2007, through her individual therapy at Northside. On March 1, 2007, the respondent was referred to the Grant Street Partnership for random urinalysis screenings to determine if it was appropriate for her to resume visitation with the child. The respon-

dent failed to attend nine of the twelve scheduled urine screen appointments, and twice tested positive for cocaine and PCP, on March 13 and 26, 2007.

On May 7, 2007, the respondent ended her individual treatment at Northside to enter the Rushford inpatient substance abuse program; however, she was unsuccessfully discharged on May 16, 2007, for failing to comply with her treatment. In August, 2007, the respondent attended the Grant Street Partnership intensive outpatient program, but she was not consistent in her attendance and again tested positive for cocaine and PCP. In early 2008, the respondent gave birth to her second son. Both the respondent and her newborn child tested positive for opiates and PCP. Based on a neglect petition that had been filed, the court entered an adjudication of neglect, and the newborn child remained with the respondent under six months of protective supervision, which was extended through September, 2009.[3] In March, 2008, the respondent entered and successfully completed inpatient substance abuse treatment at the Morris Foundation. We acknowledge the court's finding that the respondent has made significant progress in dealing with her substance abuse. According to the testimony of a department social worker, Charles Solomon, as of December, 2008, the respondent was engaged in other services, and was drug free and compliant.

A second issue of serious concern was the respondent's history of domestic violence and her continuing relationship with the child's father. In 2006, the father was arrested for allegedly grabbing the respondent, pulling her to the ground and dragging her out of the house by her coat while she held Jocquyce in her arms. In July, 2007, the father reported to the department that

---

[3] At the time of trial, the respondent's second child remained in her custody.

the respondent had stabbed him during an argument, which caused him to receive fifty staples in his stomach and spend two weeks in the hospital in critical condition. He stated that he never reported the incident to police because he did not want the respondent to get in trouble. According to Solomon, another incident occurred in 2008 where the father struck the respondent in the mouth, causing a laceration. According to the evaluation of Nancy Randall, a psychologist, the respondent admitted to several other incidents of domestic violence, involving yelling, pushing and fighting. The court particularly was concerned that the respondent failed to acknowledge the impact domestic violence has on her family, that she continues to see the child's father and that she, in fact, had a second child with him.

Additionally, housing has remained an issue for the respondent. Aside from her residence at several inpatient facilities, her primary apartment in New Haven was inadequate to allow for reunification with her son. After her discharge from the Morris Foundation, the respondent lived in New Haven with her mother until the winter of 2009. A department caseworker testified that the respondent was assisted by supportive housing in moving to Ansonia to reside in a rental apartment, though after receiving a warning for difficulty in her domestic violence counseling group, the respondent was notified that a second warning could jeopardize her housing.

Similarly, the respondent had been unable to avoid problems with the criminal justice system, another specific step enumerated by the court. From 2005 through 2008, the respondent was arrested and convicted of custodial interference, a violation of probation, criminal trespass, larceny in the sixth degree, failure to appear in court and assault in the third degree.

On the basis of the foregoing facts and additional expert testimony, the court found that the petitioner

had met her burden of proving by clear and convincing evidence that the respondent had failed to achieve a level of rehabilitation that would encourage a belief that she could, within a reasonable time, resume a responsible position in her child's life. The court further found by clear and convincing evidence that terminating the parental rights of the respondent was in the best interest of Jocquyce. This appeal followed.

I

The respondent first claims that the court's finding that she failed to achieve the degree of personal rehabilitation required under General Statutes § 17a-112 (j) (3) (B) (ii) was clearly erroneous. Because the record supports the court's finding, this claim fails.

We must first set forth the applicable standard of review governing the respondent's claims. "A trial court's finding that a parent has failed to achieve sufficient rehabilitation will not be overturned unless it is clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . .

"On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Jazmine B.*, 121 Conn. App. 376, 382–83, 996 A.2d 286, cert. denied, 297 Conn. 924, 998 A.2d 168 (2010).

"Personal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and

useful role as a parent [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Internal quotation marks omitted.) Id., 383–84.

The court's finding that the respondent had not sufficiently rehabilitated is supported by the record before us. While the respondent has shown improvement in dealing with her substance abuse, the court concluded, based in part on the testimony of Randall, that the respondent's situation remains unstable. Randall, who conducted three psychological evaluations of the respondent, was concerned that the respondent failed to acknowledge her habitual involvement in domestic violence and the impact that it has on her family. As the court wrote in its memorandum of decision, "[w]hat is most troubling to the court is [the respondent's] refusal to accept that her relationship with [the] father has been problematic for her and her child, and her refusal to acknowledge her need for domestic violence counseling until very recently. She has been arrested numerous times for domestic violence incidents with [the] father, yet she gave birth to a second child with [the] father . . . in 2008. . . . [The respondent] is either unable or unwilling to distance herself from [the] father, thus exposing herself, [her younger son] and,

potentially, Jocquyce, to further domestic violence." (Citation omitted.)

Moreover, the court agreed with Randall's conclusion that despite the progress made by the respondent, she did not appear able to care for both children. As Randall stated in her evaluation, although the respondent has made some progress in becoming more stable, "[e]motional volatility has been a long-term issue . . . . She is quick to anger, and her frustration tolerance is low. . . . [I]t continues to be an issue of concern." Randall also stated that "[the respondent] is still easily overwhelmed and likely to have difficulty with multiple demands. She does not have an understanding of how her own choices leave her at risk for further problems. She is not able to make adequate progress beyond this point within a reasonable period of time . . . to resume a responsible position in the life of her son."

Although the respondent certainly has made strides in her recovery, "[i]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . . [S]uch improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, she could assume a responsible position in the life of her [child]." (Internal quotation marks omitted.) *In re Janazia S.*, 112 Conn. App. 69, 95, 961 A.2d 1036 (2009).

On the basis of our review of the record, we conclude that the court's finding that the petitioner had established, by clear and convincing evidence, that the respondent had failed to achieve sufficient personal rehabilitation is not clearly erroneous.

II

The respondent also claims that during the dispositional phase of the trial, the court improperly found

that the termination of her parental rights was in the best interest of the child. We disagree.

"In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Citations omitted; internal quotation marks omitted.) Id., 97–98.

Pursuant to § 17a-112 (k), the statutory factors used to determine whether termination is in the child's best interest include: "(1) The timeliness, nature and extent of services offered . . . (2) whether the [d]epartment . . . has made reasonable efforts to reunite the family . . . (3) the terms of any applicable court order entered into . . . and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents . . . and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant

emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future . . . and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child . . . or by the economic circumstances of the parent." General Statutes § 17a-112 (k).

We conclude that the court, in granting the petition to terminate the respondent's parental rights, properly made its findings in consideration of the factors delineated in § 17a-112 (k). As the court found, "Jocquyce has been out of his parents' care since 2006 and started bonding with [his preadoptive] foster family in July, 2008. He has already been moved from several placements. At age four, soon to be five, he is in need of permanency. Though the court indeed commends [the respondent] for all of her efforts, the court must be guided by what is in the child's best interests."

The court based its findings on the testimony of Randall, Regine Hahn-Seltzer, a family therapist, and Nicole Funteral, a department social worker. According to Randall, "[b]ecause of [the respondent's] limited ability to handle multiple demands and her continued relationship with [Jocquyce's father] in spite of the past violence and substance abuse issues, she is not able to provide an appropriate, positive, stable home for Jocquyce at this time." Although Jocquyce has a relationship with the respondent, Randall testified that he does not look to her for his primary security or nurturance, or to fill the role of a psychological parent for him. Hahn-Seltzer, who provided advice and counseling to the preadoptive foster family, testified that Jocquyce had begun to address his foster parents as "mom and dad" and appeared more anxious around the time of visitation

with the respondent. At an evaluation in September, 2008, Randall observed that Jocquyce was not cooperative with attempts to engage him in some developmental screening, and that his anger may be related to or be exacerbated by the disruption in his placement earlier in the year and the continued uncertainty of his future placement.

In determining whether termination of the respondent's parental rights was in the best interest of Jocquyce, the court carefully considered each factor delineated in § 17a-112 (k). As the court wrote in its memorandum of decision, "[t]he court finds, based on the testimony of the social workers involved in the case, that there is a bond between Jocquyce and his foster parents. In finding that termination of the biological parents' parental rights is in the child's best interests, the court has examined multiple relevant factors, including the child's well-being, the need to avoid future placements, the continuity of his present environment, his length of stay in foster care, the nature of his relationship with his foster parents and his biological parents, and the genetic bond to his biological parents."

While the court acknowledged that counsel for the child did not support the position that the respondent's parental rights should be terminated, counsel did not take the position that the respondent was capable of caring for the child at the time of the trial. As Randall concluded, "Jocquyce has been out of his parents' care for over two years. He is in need of a permanent home. It is recommended that he be freed for adoption into a permanent family." The court was left to balance the progress made by the respondent against the effect that further delay would have on Jocquyce and his development. As the trier of fact, the court made the determination that it would not be in Jocquyce's best interest to remain in a state of flux in the hope that the respondent

would someday be able to assume a responsible position in his life. Accordingly, we conclude that it was not clearly erroneous for the court to have found that it was in the best interest of the child to terminate the parental rights of the respondent.

The judgment is affirmed.

In this opinion the other judges concurred.

---

\* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.