******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

IN RE MADISON M. ET AL.*
(AC 41469)

DiPentima, C. J., and Prescott and Flynn, Js.

*Syllabus*

The respondent father appealed to this court from the judgments of the
trial court terminating his parental rights with respect to his three minor
children pursuant to statute (§ 17a-112 [j] [3] [B] [i]) on the basis of his
failure to achieve a sufficient degree of personal rehabilitation. The
petitioner, the Commissioner of Children and Families, had filed neglect
petitions and an order of temporary custody for each of the three chil-
dren. The father was on the run from the law at that time, but the
Department of Children and Families, nevertheless, unsuccessfully
attempted to contact him by calling several numbers on file, leaving a
message with a friend, and sending letters to addresses associated with
him. The children were adjudicated neglected and placed in the custody
of the petitioner, and specific steps were ordered for the father. When
the department later contacted the father by phone, he refused to provide
the department with his location and was uncooperative. After approxi-
mately one year of evading detection, the father was arrested, incarcer-
ated, and appeared before the court at an evidentiary hearing, at which
time the previously ordered specific steps, which were not physically
delivered to the father, were admitted as an exhibit, and the court
approved the permanency plans of termination of parental rights and
adoption. In the months leading up to the trial on the petitions to
terminate the father's parental rights, the department sent several letters
to him but received no reply. Thereafter, the trial court granted the
termination petitions with respect to all three children, finding that the
father had failed to achieve sufficient personal rehabilitation. The court
also found that the father had been provided the specific steps, as
required by § 17a-112 (j) (3) (B) (i), and, alternatively, in light of his
absconding and refusal to cooperate with the department's investigation,
the failure to provide him with the steps was harmless error. *Held* that
the trial court did not err in concluding that the respondent father had
been provided specific rehabilitative steps in a manner that satisfied
the requirements of § 17a-112 (j) (3) (B) (i): under the circumstances
of the present case, where the father had evaded detection intentionally
and refused to respond to the department's repeated inquiries, and where
the previously ordered steps were admitted as an exhibit during the
evidentiary hearing, at which time the steps would have been accessible
to the father and his attorney, physical delivery of the steps to the father
was not a necessary measure, and the petitioner's efforts were more
than sufficient to ensure that he knew specific steps had been ordered
and that those steps were important to preserving his parental rights;
moreover, even if the respondent father had not been provided the
specific steps, such an omission would constitute harmless error, as
the father would have been unable to observe certain specific steps,
such as obtaining adequate housing and income, avoiding involvement
with the criminal justice system, maintaining a safe and nurturing home
environment, and developing a cohesive relationship with his children
because of his incarceration and the allegations that he had sexually
abused his children, and the physical delivery of specific steps would
have been a futile endeavor in light of the father's attitude toward the
department and reluctance to change for the better, the court having
found that the father was not ready to assume a responsible position
in the lives of the children, that he was initially separated from his
children because of his untreated substance abuse issues and general
criminality, and that there was no indication that he had any intention
of addressing those problems or becoming a stable and dependable
figure in the lives of his children.

Argued September 6—officially released October 18, 2018**

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of New Britain, Juvenile Matters, and tried to the court, *Hon. Stephen F. Frazzini*, judge trial referee; judgments terminating the parental rights of the respondent father, from which the respondent father appealed to this court. *Affirmed.*

*David J. Reich*, for the appellant (respondent father).

*Cynthia E. Mahon*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, *Jane Rosenberg*, solicitor general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

DiPENTIMA, C. J. The respondent, Donald S., appeals from the judgments of the trial court terminating his parental rights with respect to his minor children, Madison M., Deanna S., and Emma Grace S.[1] On appeal, the respondent claims that he was not provided the specific steps mandated by General Statutes § 17a-112 (j) (3) (B) (i) and, consequently, was unable to achieve a level of rehabilitation that would reasonably encourage a belief that at some future date he could assume a responsible position in the lives of his children.[2] Additionally, the respondent contends that the failure to provide him with the specific steps did not constitute harmless error. We do not agree with either argument and, therefore, affirm the judgments of the trial court.

The following factual findings of the trial court, which are not challenged, and procedural history are relevant to our consideration of the issues raised on appeal. Prior to the filing of the neglect petitions, the Department of Children and Families (department) had received numerous reports that the respondent and the children's mother were not acting as responsible parents. In 2011, the department substantiated separate instances in which the parents had failed to follow up on important medical appointments for Madison and Deanna. The next year, the department also substantiated a report that the parents had cancelled appointments for Emma Grace, only three months old at the time, against the advice of her doctor. Then, in 2013, Emma Grace missed multiple appointments with medical specialists, as well as appointments with her pediatrician.

The parents were arrested in September, 2014, on charges of risk of injury to a child; see General Statutes § 53-21; after Deanna, then six years old, was found wandering alone outside in a dirty and disheveled condition. Several months later, in April, 2015, the department received a report from Deanna's school that there was a six inch red mark on her backside. Deanna told school staff that the respondent had struck her with a knife and that he sometimes hits her with a belt. She also told school staff that "it hurts" when he hits her, but that she was "not afraid to go home." (Internal quotation marks omitted.) Following an investigation, however, "the department decided not to substantiate either parent for neglect."

During this time, the respondent was cooperative with the department's investigation. In May, 2015, he informed the assigned investigative social worker that Madison had been exhibiting behavioral issues at school and scheduled a meeting to address her individualized needs. Then, on June 2, 2015, he contacted the department to notify officials that Emma Grace had been injured when the stroller she was in fell down a flight

of stairs onto pavement. Two days later, on June 4, 2015, however, the department received reports that the respondent had been arrested on June 3, 2015, for breach of peace and interfering with a police officer, stemming from an incident at the family's home. The department's follow-up investigation revealed that the respondent had been drinking and acting "nasty" toward the mother. She told him to leave, but he refused. He later passed out in the backyard. When he woke up, he began ringing neighbors' doorbells and screaming. At some point, the mother called the police, and he was arrested. In connection with this incident, a protective order was issued, and the respondent moved out of the family's home.

The next day, June 5, 2015, the respondent attended an evaluation at Wheeler Clinic for mental health and substance abuse issues. It was recommended that he enroll in an intensive outpatient program at its facility. He agreed and successfully completed the program in July, 2015. The respondent was then referred to a relapse prevention group. Shortly after enrolling in this program, however, he was discharged "unsuccessfully" after he notified Wheeler Clinic staff that he was moving to New Haven.

In August, 2015, the respondent again was arrested, this time on motor vehicle charges. He failed to appear in court on these charges, as well as the criminal charges from the June 3, 2015 incident. Then, in October, 2015, police began an investigation into allegations made by the mother that the respondent had sexually assaulted Madison. Although the police eventually concluded that there was insufficient evidence to charge him, it was at this time that the respondent's whereabouts became unknown to the department.

In December, 2015, department social worker Brenda Matta was assigned to the children's case. She attempted to contact the respondent by using phone numbers that the department had listed for him but was unsuccessful. She also contacted a friend of the respondent and left a message for him; her call was not returned. After searching the state Judicial Branch website, Matta found two addresses for the respondent and sent letters to these locations. She received no reply.

On December 18, 2015, following a report that the mother and her new husband were consuming large amounts of alcohol while caring for the children, the department invoked a ninety-six hour hold on all three children. Four days later, petitions were filed alleging that the children were neglected. The same day, the petitioner, the Commissioner of Children and Families, also sought and obtained an ex parte order of temporary custody for each of the three children. In granting the orders of temporary custody, the court also ordered preliminary specific steps for the respondent and the

mother. Matta testified that, at the time, the whereabouts of the respondent remained unknown, and notice of the orders of temporary custody was made by publication.

A preliminary hearing on the ex parte orders of temporary custody was held on December 29, 2015; neither parent attended. At the preliminary hearing on the orders of temporary custody, the court found that abode service had been made on the mother and sustained the orders without prejudice to the respondent, as publication was still pending. On January 27, 2016, a preliminary hearing on the neglect petitions was held, which neither parent attended. After finding proper service and compliance with Practice Book § 17-21, the court entered defaults against both parents for failing to appear, adjudicated the children to be neglected and ordered the petitioner to file a motion to review the permanency plan by September 13, 2016.[3] The children were committed to the care of the petitioner and specific steps were again ordered for each parent.

Finally, in February, 2016, the department was able to speak with the respondent after an official from Deanna's school contacted Matta and informed her that they had received a phone call from an individual claiming to be Deanna's father. Matta called the number the school provided and spoke with an individual who identified himself as the respondent. During their conversation, the respondent said he wanted to see his children but refused to provide his address. He became loud, threatening, and verbally abusive, before hanging up. Sometime between March and July, 2016, Matta attempted to contact him again at the same number but was unsuccessful.

In July, 2016, after nearly a year of evading detection, the respondent was arrested and incarcerated. Two months later, Madison informed her therapist that the respondent had sexually abused her and her two sisters, and the therapist reported the allegations of sexual abuse to the department. On September 16, 2016, the petitioner, pursuant to Practice Book § 34a-23, filed a motion for emergency relief seeking an order suspending the respondent's visits with the three children until the department completed an investigation into the allegations of sexual abuse.[4] The court granted the petitioner's motion ex parte the same day it was filed. Following an investigation into the allegations, the respondent was arrested and charged with multiple felonies. The charges remained pending as of the date of the court's decision to terminate the respondent's parental rights.

Approximately one month after issuing the emergency ex parte order suspending the respondent's visitation rights, the court held a hearing on the petitioner's motion to review the permanency plan.[5] At this hearing, the petitioner notified the court for the first time that

the respondent was incarcerated. The hearing was continued until November 9, 2016, at which time the respondent appeared and was appointed counsel. Initially, the respondent, through counsel, objected to the petitioner's motion; however, at the evidentiary hearing on December 7, 2016, the respondent withdrew his objection. During the hearing, and in the presence of the respondent and his attorney, the petitioner introduced as an exhibit a social study in support of her motion to review the permanency plan, which included the specific steps ordered by the court on January 27, 2016. At the end of the hearing, the court approved the permanency plans of termination of parental rights and adoption.

Upon learning that the respondent was incarcerated, Matta began sending letters to him once a month. The letters identified her as the social worker assigned to the family's case, requested the respondent's participation in the case, and provided him with her direct line. He did not respond to these letters. In December, 2016, Matta was able to speak with the respondent over the phone, at which time he told her that he did not want the department to contact him anymore. Despite this statement, Matta continued to send him letters. She spoke with the respondent once more in May, 2017, this time seeking information for the termination of parental rights social study. During their conversation, the respondent became angry and stopped answering questions.

On April 27, 2017, petitions were filed seeking to terminate the parental rights of the respondent. The petitions alleged grounds for termination pursuant to §§ 17a-112 (j) (3) (B) (i) and (C). On October 24 and 30, 2017, a trial was held on the petitions to terminate. Following the presentation of evidence and closing arguments, the court ordered posttrial briefs addressing the issue of whether the respondent had been provided the specific steps, as required by statute, and heard oral argument from the parties on December 6, 2017.

In a thorough and well reasoned memorandum of decision, dated February 7, 2018, the trial court granted the termination petitions with respect to all three children and rendered judgments accordingly.[6] In its decision, the court found that there was clear and convincing evidence that the department had made reasonable efforts to locate the respondent, and that he had been unwilling or unable to benefit from reunification efforts. Further, the court found that the respondent had failed to achieve a degree of personal rehabilitation that would encourage a belief that, within a reasonable time, he could assume a responsible position in the lives of his children.[7] See General Statutes § 17a-112 (j) (3) (B) (i). Concomitantly, the court found that the respondent had been provided the specific steps as required by statute and, alternatively, in light of his

absconding and refusal to cooperate with the department's investigation, failure to provide him with the steps was harmless error. This appeal followed. Additional facts will be set forth as necessary.

The issue presented on appeal is whether the trial court erred in holding that the respondent had been "provided" specific rehabilitative steps in a manner that satisfies the requirements of § 17a-112 (j) (3) (B) (i) and, if so, whether failing to provide him with the steps was harmless. "Our review of the court's interpretation of this statute is plenary." *In re Unique R.*, 170 Conn. App. 833, 845, 156 A.3d 1 (2017).

"Proceedings to terminate parental rights are governed by § 17a-112. . . . Under [that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. The [Commissioner of Children and Families] . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds." (Internal quotation marks omitted.) *In re Mariana A.*, 181 Conn. App. 415, 427, 186 A.3d 83 (2018). "Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun." (Internal quotation marks omitted.) *In re Egypt E.*, 327 Conn. 506, 527, 175 A.3d 21 (2018), cert. denied sub nom. *Morsy E.* v. *Commissioner of Children & Families* (U.S. October 1, 2018) (No. 17-1549).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *In re Nevaeh W.*, 317 Conn. 723, 729–30, 120 A.3d 1177 (2015).

Pursuant to § 17a-112 (j) (3) (B), parental rights may be terminated if "the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding, or (ii) is found to be neglected, abused or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." Further, in *In re Elvin G.*, 310 Conn. 485, 500–506, 78 A.3d 797 (2013), overruled in part on other grounds by *In re Shane M.*, 318 Conn. 569, 587–88, 122 A.3d 1247 (2015), our Supreme Court concluded that the specific steps requirement found in subparagraph (B) applies to both clauses (i) and (ii), and, in most cases, when seeking to terminate parental rights under either ground, the petitioner must show by clear and convincing evidence that steps had been ordered and provided to the respondent. Neither the statute nor our case law, however, establishes a definition of the term "provided."

The respondent argues that "provided," as it is used in the context of this statute, requires physical delivery of the specific steps to the parent. In this regard, the respondent contends that at some point following his appearance in this case at the November, 2016 hearing, the petitioner or the court should have given him a copy of the previously ordered specific steps or, at the very least, communicated those steps, and their significance, to him. He claims that failure to do so was tantamount to noncompliance with the requirements of § 17a-112 (j) (3) (B) (i), for which we must reverse the judgments of termination. We are not persuaded.

As our Supreme Court explained in *In re Elvin G.*, supra, 310 Conn. 507–508, the "[s]pecific steps provide notice and guidance to a parent as to what should be done to facilitate reunification and prevent termination of rights. Their completion or noncompletion, however, does not guarantee any outcome. A parent may complete all of the specific steps and still be found to have failed to rehabilitate. . . . Conversely, a parent could fall somewhat short in completing the ordered steps, but still be found to have achieved sufficient progress so as to preclude a termination of his or her rights based on a failure to rehabilitate." (Citation omitted.) In some respects, "[t]he specific steps are [simply] a benchmark by which the court will measure the respondent's conduct to determine whether termination is appropriate pursuant to § 17a-112 (j) (3) (B)." (Internal quotation marks omitted.) *In re Shane M.*, 148 Conn. App. 308, 329, 84 A.3d 1265 (2014), aff'd, 318 Conn.

569, 122 A.3d 1247 (2015). Indeed, when "determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department." (Internal quotation marks omitted.) *In re Jazmine B.*, 121 Conn. App. 376, 390–91, 996 A.2d 286, cert. denied, 297 Conn. 924, 998 A.2d 168 (2010).

The petitioner contends that just as General Statutes § 45a-716,[8] which § 17a-112 incorporates by reference, allows for multiple means of legal service, we should construe "provide" in a similar flexible and administratively efficient fashion. For her part, the petitioner claims that this position is logically consistent with the plain meaning of "provide," which is defined as "to supply or make something available . . . ." See Merriam-Webster's Collegiate Dictionary (11th Ed. 2003); see also *Vazquez* v. *Buhl*, 150 Conn. App. 117, 129, 90 A.3d 331 (2014) ("[a]ccording to one dictionary, the definition of 'provide' is to: 'make (something) available' or 'supply (something that is wanted or needed) . . . .' "). From this common definition, it is argued, one cannot necessarily infer that "provide" requires a direct conveyance from one person to another.

Although we find merit in this position, we are reluctant to graft into the statute a one-size-fits-all definition prescribing the efforts the petitioner must undertake in order to ensure that a respondent is apprised of the specific steps. Rather, it is more consistent with our jurisprudence in this area that this issue be addressed on a case-by-case basis in light of the particular facts before the court. See, e.g., *In re Stanley D.*, 61 Conn. App. 224, 231, 763 A.2d 83 (2000) (noting that for purposes of § 17a-112 "reasonable time" is factual determination to be made on case-by-case basis). In this regard, there might be some circumstances where merely making the specific steps available in the court file would be inadequate given the respondent's involvement in the case and cooperation with the department. Conversely, where the respondent has evaded detection intentionally and/or refused to respond to the department's inquiries, we do not believe that physical delivery of the steps is a necessary measure. The upshot of this approach is that the court balances the respondent's willingness to participate in the proceedings against the petitioner's efforts to notify the parent of the actions needed to facilitate reunification and avoid termination.

Applying this approach to the unchallenged facts of this case, we conclude that the respondent was provided with the specific steps, as required by § 17a-112 (j) (3) (B) (i). In December, 2015, when the children were first placed in the custody of the petitioner, the respondent was on the run from the law. During the initial stages of these proceedings, the department

attempted to contact him by calling several numbers on file, leaving a message with a friend, and sending letters to addresses associated with him. Further, once contact was made with the respondent in February, 2016, he refused to provide the department with his location, became argumentative, and eventually hung up on the department social worker. After he was incarcerated and appeared in court, the previously ordered steps were admitted as an exhibit during the December, 2016 evidentiary hearing. At this time, the steps would have been accessible to the respondent and his attorney, if they had not been already. Finally, in the months leading up to the October, 2017 trial, the department sent several letters to the respondent asking for his cooperation with the termination of parental rights social study, but received no reply. Accordingly, given the respondent's recalcitrance throughout this process, the petitioner's efforts were more than sufficient to ensure that he knew specific steps had been ordered and that those steps were important to preserving his parental rights. To require physical delivery of the steps in this circumstance would only encourage respondents to take a contentious or evasive posture during the pendency of their case.

Even if we were to determine, however, that the respondent had not been provided the specific steps, such an omission simply would constitute harmless error in this context. As in *In re Elvin G.*, supra, 310 Conn. 509–17, where hindsight demonstrates that the respondent would have been unable or unwilling to observe specific steps, had they been provided, the absence of such steps does not vitiate an otherwise valid judgment. Here, the steps ordered in December, 2015, and January, 2016, required the respondent to obtain adequate housing and income, avoid involvement with the criminal justice system, and maintain a safe, stable and nurturing home environment, all of which he could not accomplish given his incarceration. Moreover, following new allegations of sexual abuse, the respondent was no longer permitted to visit with the children, which in turn prevented him from developing a cohesive relationship with them, which was another required step. Finally, many of the steps mandated that the respondent cooperate and communicate regularly with the department, which as evidenced in the record, he failed to do repeatedly.

We find our conclusion of harmless error further supported by the fact that the respondent does not contest the trial court's finding that he failed to rehabilitate. In deciding to terminate his parental rights, the trial court found that the respondent was not ready to assume a responsible position in the lives of the children, especially in view of the childrens' ages and particular needs. Additionally, the court noted that it was the respondent's untreated substance abuse issues and general criminality that initially led to his separation

from the children. There was no indication from his conduct throughout the proceedings, even following his incarceration, that he had any intention of addressing these problems or becoming a stable and dependable figure in the lives of his children. As such, any physical delivery, if required, of specific steps would have been a futile endeavor in light of the respondent's attitude toward the department and reluctance to change for the better. See *In re Jazmine B.*, supra, 121 Conn. App. 390–91 ("[i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department" [internal quotation marks omitted]).

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** October 18, 2018, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The children's mother consented to the termination of her parental rights and did not participate in this appeal.

[2] On September 5, 2018, the attorney for the minor children filed a statement pursuant to Practice Book § 67-13, adopting the position of the petitioner, the Commissioner of Children and Families.

[3] "The statutes governing permanency plans were adopted to comply with federal law regulating state access to federal funding for children who have been removed from their parents . . . . In order to continue to receive federal funds, Congress requires states to review permanency plans every twelve months. 42 U.S.C. § 622 (a) and (b) (8) (A) (ii) (2012)." (Citation omitted.) *In re Mindy F.*, 153 Conn. App. 809, 812–13 n.5, 104 A.3d 799 (2014), cert. denied, 315 Conn. 913, 106 A.3d 306 (2015); see also Practice Book § 35a-14.

[4] Prior to this order, the respondent had not visited with children at any point while they were in the custody of the petitioner.

[5] See footnote 3 of this opinion.

[6] On May 23, 2018, the trial court issued a corrected memorandum of decision, which fixed an error regarding the date on which it held a hearing on the motion to review the permanency plan.

[7] The court found that the petitioner had not met her burden of proof to establish grounds for termination under § 17a-112 (j) (3) (C). Specifically, the court considered evidence that a previous investigation into claims of sexual molestation by the respondent concluded that "the mother was instigating [Madison] to make the allegation." Additionally, the court noted "the vague nature of the current allegations, questions about [the respondent's] opportunity to abuse the children after their statements of affection for him, and the court's lack of opportunity to hear from police or the forensic interviewer about the children's statements or to hear testimony from the children themselves in order to assess the reliability and credibility of those allegations . . . ." (Footnote omitted.) We do not address this issue on appeal, as the petitioner did not present it as an alternative ground to affirm.

[8] "Except as provided in subsection (d) of this section, notice of the hearing and a copy of the petition, certified by the petitioner, the petitioner's agent or attorney, or the clerk of the court, shall be served at least ten days before the date of the hearing by personal service or service at the person's usual place of abode on the persons enumerated in subsection (b) of this section who are within the state, and by first class mail on the Commissioner of Children and Families and the Attorney General. If the address of any person entitled to personal service or service at the person's usual place

of abode is unknown, or if personal service or service at the person's usual place of abode cannot be reasonably effected within the state, or if any person enumerated in subsection (b) of this section is out of the state, a judge or the clerk of the court shall order notice to be given by registered or certified mail, return receipt requested, or by publication at least ten days before the date of the hearing. Any such publication shall be in a newspaper of general circulation in the place of the last-known address of the person to be notified, whether within or without this state, or, if no such address is known, in the place where the petition has been filed." General Statutes § 45a-716 (c).

---