******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE UNIQUE R.*
(AC 39020)

DiPentima, C. J., and Sheldon and Schaller, Js.

*Argued September 8, 2016—officially released February 17, 2017***

(Appeal from Superior Court, judicial district of Fairfield, Juvenile Matters at Bridgeport, Maronich, J.)

*Marina L. Green*, assigned counsel, with whom, was *James P. Sexton*, assigned counsel, for the appellant (respondent father).

*Evan O'Rourke*, assistant attorney general, with whom were Stephen Vitelli, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, *Gregory T. D'Auria*, solicitor general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Kate M. Zarro*, for the minor child.

*Opinion*

SHELDON, J. In this appeal from the judgment of the trial court terminating his parental rights to his minor daughter, Unique R., the respondent father, Samuel M.,[1] claims that the court erred in concluding, as required to support a judgment of termination under General Statutes § 17a-112 (j) (1),[2] that the Department of Children and Families (department) made reasonable efforts to reunify him with his daughter, in accordance with General Statutes § 17a-111b (a),[3] before the Commissioner of Children and Families (petitioner) initiated termination proceedings against him. The respondent contends, more specifically, that the department's efforts to reunify him with his daughter were not reasonable because it failed to conduct an adequate investigation into the availability and suitability of two of his relatives, his mother and his sister, Jennifer D., to serve as possible placement resources for Unique after she was taken into the petitioner's custody pursuant to an ex parte order of temporary custody at an earlier stage of the investigation that led ultimately to the filing of a termination petition against him. The respondent claims that the department's failure to conduct an adequate investigation into the availability and suitability of his mother and his sister to serve as possible placement resources for Unique, after he had provided their names and contact information to the department for that purpose, precluded the trial court from finding that the department had made reasonable efforts to reunify him with his daughter, and thus requires this court to reverse the trial court's judgment terminating his parental rights.

We disagree with the respondent for two primary reasons. First, the department's investigation of relative resources is not aimed at the reunification of the child with his or her parent and is therefore not a necessary consideration when determining whether to terminate a parent's parental rights. Second, even if the department's alleged failure to exercise due diligence in investigating relative resources was a proper consideration in assessing the reasonableness of its efforts to reunify the respondent with his daughter, said assessment is based upon a totality of the circumstances, taking multiple factors into consideration. We thus affirm the judgment of the trial court.

This case arises against the background of the following factual and procedural history, as described by the trial court in its memorandum of decision terminating the respondent's parental rights to Unique. Unique was born in January, 2011, to her mother, Kaycee R. The respondent, Unique's biological father, was not present for her birth and, in fact, had no contact with her throughout the first two years of her life. Thereafter, in February, 2013, the department received an anonymous phone call concerning the health and safety of Unique

and Jeramiah P., her half brother by another father, who were then living in their mother's home. During its ensuing investigation as to the children's welfare, the department initially allowed the children to remain in the custody of Kaycee R. while providing her with assistance in caring for them. When that arrangement proved to be unsuccessful, however, the petitioner filed separate neglect petitions as to each child on November 14, 2013, on the common ground that they were being denied proper care in their mother's home, where the living conditions were injurious to their well-being.

On January 21, 2014, the petitioner invoked a ninety-six hour hold as to Unique and Jeramiah, pursuant to General Statutes § 17a-101g (e),[4] and removed them from their mother's home, citing concerns that the home environment posed an immediate physical danger to them. Three days later, on January 24, 2014, the petitioner requested the issuance of an ex parte order of temporary custody. The ex parte order was issued by the trial court, *Kaplan, J.*, on January 27, 2014. After Unique was taken into custody by the petitioner, she was diagnosed as suffering from asthma and anemia, was found to have high levels of lead in her blood, and was determined to be experiencing developmental delays.

Upon issuing the ex parte order of temporary custody, the court provided the respondent, pursuant to General Statutes § 46b-129 (b),[5] with several "preliminary specific steps," which it deemed necessary for him to take in order to address the problems that had led to the issuance of the order of temporary custody, and thus to gain custody of Unique. Those specific steps included, inter alia, requirements that the respondent: (1) keep all appointments set by the department; (2) participate in parenting and individual counseling sessions to address how substance abuse affected his life and parenting; (3) submit to treatment programs; (4) submit to random drug testing and refrain from using drugs or abusing alcohol; (5) obtain and maintain adequate housing and legal income; (6) visit Unique as often as permitted by the department; and (7) "[w]ithin thirty (30) days of this order, and at any time after that, tell [the department] in writing the name, address, family relationship and birth date of any person(s) who [he] would like the department to investigate and consider as a placement resource for the child(ren)."[6] At the same time and pursuant to the same statute, the trial court provided specific steps to the department, ordering it, inter alia: (1) to provide the respondent with case management services and referrals to treatment programs for his mental health and substance abuse issues; and (2) to "complete the investigation and consideration of any person(s) whom the respondent has properly identified as a placement resource for the child(ren) [within thirty days of the receipt of written notice by the respondent.]"

After Unique and Jeramiah were removed from their mother's home, they were initially placed in emergency foster care. The following month, they were transitioned into a nonrelative, medically complex foster home under the care of Mr. and Mrs. J. In that same time frame, the department began to investigate the children's relatives in an effort to place the children with family members while they were separated from their parents. To that end, after their maternal grandparents filed a motion to intervene on February 11, 2014, the department began to investigate the possibility of placing Unique and Jeramiah in their home. Ultimately, however, the department declined to pursue such a placement because the grandparents already were caring for Unique's four older siblings.

On May 7, 2014, the trial court adjudicated the neglect petitions as to Unique and Jeramiah. The respondent had been duly served with the neglect petition for Unique, but he had defaulted. The court adjudged both children to be neglected and committed them to the petitioner's custody. At that time, the trial court provided the respondent with "final specific steps," which it deemed necessary for him to take to address the problems that had led to the neglect adjudication, and thus to gain custody of Unique.[7]

The following day, May 8, 2014, the department made a referral to the state of Alabama, pursuant the Interstate Compact on the Placement of Children, General Statutes § 17a-175, in an effort to place Jeramiah with his paternal aunt, Cory P., a resident of Alabama whom Jeramiah's father had presented as a potential placement resource for him. Cory agreed to start adoptive parenting classes in August, 2014, but stated that she might have difficulty in obtaining the necessary medical examination due to its cost. This referral ultimately was denied by Alabama because Cory missed a filing deadline in the application process and also was unable, as she had foreseen, to obtain the necessary physical examination due to her lack of health insurance.

On February 25, 2015, the petitioner filed separate termination petitions with respect to the two children. The petition for termination with respect to Unique alleged that the respondent's parental rights as to Unique should be terminated on two grounds: first, that he had failed to rehabilitate since she was adjudged to be neglected; and second, that he had no ongoing parent-child relationship with her. The termination trial was scheduled for January, 2016.

After the petitioner filed the termination petitions, but before the termination trial began, the department continued to investigate possible relative resources for the placement of Unique and Jeramiah. Among the persons it attempted to investigate for that purpose were the respondent's mother and his sister, Jennifer D. The

respondent had proposed both women as possible placement resources for Unique and informed the department that the best way to reach them was by calling his mother's telephone number, which he provided. Although the department attempted to contact the two women by calling them at that number, it never made contact with them because its call was not returned. The department also sought to investigate the availability and suitability of the respondent's other sister, Samantha R., to serve as a possible placement resource for Unique and Jeramiah because, at one point, she had expressed a possible interest in adopting them. The department determined, however, that Samantha was not in a suitable economic position to care for both children, and so it ceased all efforts to recruit her for that purpose. In June, 2015, several months after the petitioner had filed termination petitions as to Jeramiah and Unique, the department resumed its efforts to place them with Jeramiah's paternal aunt, Cory, in Alabama.[8] Through the coordinated efforts of the department and Cory's healthcare provider, she obtained the necessary medical examination for that purpose in late 2015. Thereafter, upon completing a second Interstate Compact referral, the department began the process of licensing Cory as a relative foster parent. To that end, by the end of November, 2015, Cory had completed all of the necessary foster care classes, and her home had been approved as a suitable living space for the children. These promising efforts ultimately came to naught, however, when the department received a phone call from Cory on January 12, 2016, the day before the scheduled start of the termination trial, informing it that she was no longer able to care for the children. The trial commenced the following day.

The trial continued on three separate days until January 27, 2016. The respondent did not attend the trial, but his counsel was present and participated fully on his behalf. Thereafter, on February 9, 2016, the trial court rendered its decision, terminating the respondent's parental rights to Unique.

In its memorandum of decision, the trial court made several findings that are relevant to this appeal. First, it provided a comprehensive review of the children's lives, describing their educational and healthcare needs and explaining how those needs were then being met by Mr. and Mrs. J., their foster parents. The court next found, inter alia, that the department had made continuous efforts to place the children with family members, although it noted specifically, with regard to the two relatives whom the respondent had proposed as possible placement resources for Unique, that "[the department] ha[d] never been able to contact either [of them] at the phone number which he provided."

As for the respondent, the court found that he had had "a long history of substance abuse and mental health

issues" and that he was "currently diagnosed with psychotic disorder, bipolar disorder and post-traumatic stress syndrome." The court further noted that the respondent had had no interaction with his daughter until she was more than two years old, and that his later contact with her in the two years prior to trial had been sporadic.

In the adjudicatory portion of its memorandum of decision, the court first noted that the petitioner had alleged two statutory grounds for termination of the respondent's parental rights to Unique, pursuant to § 17a-112 (j) (3): (1) that Unique had "been found in a prior proceeding to have been neglected . . . and the [respondent had] failed to achieve such degree of personal rehabilitation as would encourage the belief that . . . [the respondent] could assume a responsible position within the life of the child;" and (2) that "there was no ongoing parent-child relationship"[9] between the respondent and Unique.

As for the first alleged ground for the termination of the respondent's parental rights, the court found, for the following reasons, that that ground had been established by clear and convincing evidence. The department had provided extensive services to aid the respondent in his rehabilitation. Those services had included "parenting classes and education, both inpatient and outpatient substance abuse treatment, mental health treatment, supervised visitation and case management . . . ."[10] Despite the provision of such services, the respondent continued to suffer from "debilitating mental health and substance abuse problems" as he had "never successfully completed any treatment program to which he [had] been referred and there [was] no reasonable prospect that he [would.]"

As for the second alleged ground for the termination of the respondent's parental rights, the court also found, for the following additional reasons, that that ground had been established by clear and convincing evidence. The respondent had been incarcerated for more than half of Unique's life, and "he [had] never cared for Unique or had to meet her needs on a day-to-day basis." The respondent had attended only eight of the thirty-nine visits with Unique that the department had arranged for him before he was reincarcerated in November, 2014, for violating his probation. As a result of such behavior and its consequences, a bond only recently had begun to form between the respondent and Unique, but in spite of that developing bond, Unique had come to view the respondent as "nothing more than a visiting resource."

On the basis of the foregoing findings, the court further found, by clear and convincing evidence, that the department had made reasonable efforts to reunify the respondent with Unique, but that the respondent had failed either to rehabilitate or to establish an ongoing

parent-child relationship with his daughter. The court thereupon determined that it was in Unique's best interests for the respondent's parental rights to be terminated in order to facilitate her speedy adoption. Thereafter, the respondent filed the present appeal. Additional facts will be set forth as necessary.

On appeal, the respondent claims that the trial court erred in finding that the department had made reasonable efforts to reunify him with Unique before the petitioner initiated termination proceedings against him. More specifically, the respondent claims that the department's duty to make reasonable efforts to reunify a parent and his child, pursuant to § 17a-112 (j) (1), requires it to use due diligence to identify and investigate possible relative resources for the placement of the child. Because, he claims, the petitioner failed to prove that the department took adequate steps to investigate his mother and sister as possible placement resources for Unique before it filed the petition to terminate his parental rights, the trial court was precluded from finding that the department made reasonable efforts to reunify him and his daughter, and thus from granting the termination petition.[11] We are not persuaded.

We begin with our standard of review. The gravamen of the respondent's claim on appeal is that the trial court misapplied the statutory requirements of § 17a-112 (j) (1) by failing to recognize an implicit mandatory requirement that, as part of its efforts to reunify a parent with a child, the department must conduct an adequate investigation into the availability and suitability of the parent's relatives as possible placement resources for the child. Our review of the court's interpretation of this statute is plenary. See *In re Elvin G.*, 310 Conn. 485, 499, 78 A.3d 797 (2013).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply." (Internal quotation marks omitted.) *Earl B.* v. *Commissioner of Children & Families*, 288 Conn. 163, 173–74, 952 A.2d 32 (2008). "The intent of the legislature, as [our Supreme Court] has repeatedly observed, is to be found not in what the legislature meant to say, but in the meaning of what it did say." (Citation omitted, internal quotation marks omitted.) *In re Daniel N.*, 163 Conn. App. 322, 332, 135 A.3d 1260, rev'd on other grounds, 323 Conn. 640,      A.3d      (2016). "In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does

not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Earl B.* v. *Commissioner of Children & Families*, supra, 174.

We first note that, "[i]n order to terminate a parent's parental rights under § 17a-112, the petitioner is required to prove, by clear and convincing evidence, that: (1) the department has made reasonable efforts to reunify the family . . . (2) termination is in the best interest of the child . . . and (3) there exists any one of the seven grounds for termination delineated in § 17a-112 (j) (3)."[12] (Citations omitted; footnote omitted.) *In re Samantha C.*, 268 Conn. 614, 628, 847 A.2d 883 (2004).

Pursuant to § 17a-112 (j) (1), "[t]he Superior Court, upon notice and hearing . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made *reasonable efforts to locate the parent and to reunify the child with the parent* in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing . . . or determines at trial on the petition, that such efforts are not required." (Citations omitted; emphasis added.) The plain language of subsection (j) (1) does not expressly state that the department, in demonstrating that it made reasonable efforts to reunify the parent and the child, must prove that it adequately investigated proposed relative placement resources for the child. Therefore, the only means by which this court can conclude that § 17a-112 (j) (1) includes such an obligation, as the respondent proposes, is for this court to interpret the phrase "reasonable efforts . . . to reunify the child with the parent" as implicitly imposing such a requirement. Id. Such an interpretation, however, is not supported by the plain language of either § 17a-112 or § 17a-111b, to which § 17a-112 (j) (1) expressly refers.

Although the focus of our analysis is on the language of § 17a-112 (j) (1), we are mindful that the petitioner's ability to pursue the termination of parental rights is predicated on the existence of at least one of the statutory grounds for the termination of parental rights delineated in § 17a-112 (j) (3). See *In re Samantha C.*, supra, 268 Conn. 628. Therefore, we begin our analysis by examining the plain language of § 17a-112 (j) (3) and

its effect on the department's efforts to reunify pursuant to § 17a-112 (j) (1). Section 17a-112 (j) (3) contains seven statutory grounds for terminating a parent's parental rights. These seven grounds cover a range of possible deficiencies in a parent-child relationship that led to the petitioner's intervention, on behalf of the state, in order to protect the child's welfare. These grounds include, inter alia: abandonment of the child; physical or sexual abuse of the child by either the parent or a spouse or cohabitor; the lack of an ongoing parent-child relationship; the parent's failure to provide for the child's moral or educational well-being; or instances where the child has been previously adjudicated neglected by the court and the parent, after being "provided specific steps to take to facilitate the return of the child . . . pursuant to section 46b-129 . . . failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." General Statutes § 17a-112 (j) (3).

The statutory grounds for termination advanced by the petitioner, pursuant to subsection (j) (3), depend on the facts and circumstances presented in each case. Because § 17a-112 (j) requires the petitioner to allege at least one of these statutory grounds in support of its petition to terminate the respondent's parental rights, these deficiencies in the parent-child relationship logically must exist prior to the petitioner's decision to file a petition to terminate such relationship. Consequently, it is against the backdrop of the particular deficiencies in the parent-child relationship, as alleged by the petitioner pursuant to subsection (j) (3), that the department assumes the obligation to make reasonable efforts to reunify the child with the parent pursuant to subsection (j) (1). See General Statutes § 17a-112 (j) (1) through (3).

A logical reading of these provisions is that the department's efforts to reunify a particular parent and a particular child, pursuant to § 17a-112 (j) (1), are dictated by the particular deficiencies in the parent-child relationship, pursuant to subsection (j) (3), which resulted in the petitioner's decision to file the petition. As such, it follows that the department's efforts to reunify a parent with a child must be intended to assist the parent to overcome the particular deficiencies alleged, pursuant to subsection (j) (3), and the reasonableness of such efforts is to be judged by determining whether such efforts would effectively assist a willing parent to overcome those deficiencies so that he or she could reassume a responsible parental role in the child's life.

Our reading of § 17a-112 (j) as creating a connection between the statutory grounds alleged in support of the petition to terminate parental rights and the depart-

ment's duty to make reasonable efforts to reunify is further reinforced by the plain language of § 17a-111b, which is expressly referenced within the language of § 17a-112 (j) (1). Notably, § 17a-111b (a) does not define "reasonable efforts to reunify" pursuant to § 17a-112 (j) (1). Rather, § 17a-111b (a) provides that "[t]he Commissioner of Children and Families shall make reasonable efforts to reunify a parent with a child unless the court (1) determines that such efforts are not required pursuant to subsection (b) of this section or subsection (j) of section 17a-112, or (2) has approved a permanency plan other than reunification pursuant to subsection (k) of section 46b-129."

Although the language of § 17a-111b (a) provides little guidance on the question of what constitutes "reasonable efforts to reunify," the plain language of §17a-111b (b) supports the notion that whether the department made reasonable efforts to reunify the parent with the child is based on whether the department's efforts and services could effectively assist the parent in overcoming the statutory grounds advanced by the petitioner, pursuant to § 17a-112 (j) (3). Section 17a-111b (b) provides in relevant part: "The Commissioner of Children and Families . . . may, at any time, file a motion with the court for a determination that reasonable efforts to reunify the parent with the child are not required. . . . The court may determine that such efforts are not required if the court finds upon clear and convincing evidence that [at least one of five aggravating factors exists]." The aggravating factors listed in subsection (b) include, inter alia, instances where: the child has been abandoned; the parent has knowingly inflicted or knowingly allowed another to inflict sexual molestation or severe physical abuse upon the child; the parent has deliberately killed a sibling of the child; the parent has had his or her parental rights to another child terminated within the last three years and, during the prior termination proceeding, the department made reasonable efforts to reunify the parent with the child; or where the parent has surrendered his or her infant child to the care of the state. See id. These aggravating factors apply to cases where the conduct of the parent is either so severe or so detrimental to the child's health and well-being that the department is relieved of its obligation to make reasonable efforts to reunify the parent and the child before seeking the termination of parental rights, because such efforts would be either futile or inconsistent with the child's best interests. See *In re S.D.*, 115 Conn. App. 111, 119, 972 A.2d 258 (2009).

This interpretation is further supported by the plain language of § 17a-112 (k), which governs the dispositional phase of the termination proceedings.[13] Subsection (k) provides, in relevant part, that "in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of ser-

vices offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent . . . (3) the terms of any *applicable* court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order . . . [and] (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future . . . ." (Emphasis added.) General Statutes § 17a-112 (k). The flexible nature of this language allows the court to consider the conduct of both the parent and the department in addressing *any* of the seven statutory grounds contained within subsection (j) (3). This is entirely consistent with the notion that the department's efforts to reunify a parent with a child is case specific, and that the purpose of these efforts is to assist the parent in adjusting his or her "circumstances, conduct, or conditions" in order to reassume a responsible parental role in the child's life. See id.

On the basis of the plain language of the relevant provisions of § 17a-112 and their relationships to each other, we are able to form three conclusions. First, the interconnection among § 17a-112 (j) (1) and (3), and (k) reveals a legislative intent that, in attempting to reunify the parent with the child pursuant to subsection (j) (1), the department must make reasonable efforts to assist the parent in addressing and overcoming the specific impediments preventing reunification, i.e., the statutory grounds advanced by the petitioner pursuant to subsection (j) (3). Second, by operation of the plain language of § 17a-111b (b), the department's duty to make reasonable efforts to reunify the parent with the child arises only when the parent has a reasonable prospect of overcoming the particular statutory ground for termination and, thereafter, reassuming a responsible parental role in the child's life. Third, in assessing the department's efforts to reunify a parent with a child, understood as aforesaid, an important factor to be considered is the degree to which the department complied with all "applicable" court orders issued for that purpose. In sum, the plain language of these provisions makes clear that the court's inquiry, pursuant to § 17a-112 (j) (1) and (3), is narrowly focused on the parent's willingness and ability to adjust his conduct in light of the services offered by the department and, when determining whether the department made reasonable efforts to reunify a parent with a child, the court is obligated to consider only those efforts that are designed and intended to assist the parent in overcoming the applicable statutory grounds for termination. Thus, unless there is a logical connection between the investigation of proposed placement resources and the parent's ability to overcome the deficiencies advanced in subsection (j) (3), the department would not be obli-

gated to prove that it adequately investigated such resources as part of its burden of proving, by clear and convincing evidence, that it made reasonable efforts to reunify the parent and the child pursuant to subsection (j) (1).[14]

There is nothing in the plain language of these provisions to support the respondent's assertion that the department's investigation into proposed temporary or permanent placement resources for the child logically assists the parent in overcoming the statutory grounds for termination delineated in § 17a-112 (j) (3). Similarly, there is nothing within the plain language of either §§ 17a-112, 17a-111a, or 17a-111b to support the respondent's argument that, during the termination of parental rights proceeding, the petitioner bears the burden of proving, by clear and convincing evidence, that it conducted an adequate investigation into the respondent's proposed placement resources for his daughter. Further, the court's interpretation of these statutes, pursuant to § 1-2z, does not produce an absurd or unworkable result, or one that runs counter to the purpose of these statutory provisions. Because these statutes are devoid of any language demonstrating a legislative intent that the petitioner bears the burden to prove, during the termination proceedings, that the department adequately investigated every proposed placement resource for the child, we conclude that the respondent's argument fails as a matter of statutory interpretation.

The foregoing statutory analysis is further supported by our case law. Our courts have had countless opportunities to interpret the department's obligation to make "reasonable efforts to reunify," pursuant to § 17a-112 (j) (1), as it relates to the specific steps provided by the court during the early stages of child protection cases. In interpreting the meaning of the phrase "reasonable efforts to reunify," our courts have consistently held that "[t]he word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn." (Internal quotation marks omitted.) *In re Daniel C.*, 63 Conn. App. 339, 361, 776 A.2d 487 (2001). "[R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case." (Internal quotation marks omitted.) *In re Ebony H.*, 68 Conn. App. 342, 349, 789 A.2d 1158 (2002). "[R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Daniel C.*, supra, 361.

Because the test for determining whether the depart-

ment made reasonable efforts to reunify a parent with a child is fact specific, factors relevant to one case may not necessarily be relevant to another case. Compare *In re Ebony H.*, supra, 68 Conn. App. 350 with *In re James G.*, 178 Md. App. 543, 600, 943 A.2d 53 (2008) ("[D]espite the department's 'shameful and unacceptable' single referral for housing [in *In re Ebony H.*, the court found that reasonable efforts had been made] because the impediment to reunification was not the parent's lack of housing. Rather, it was her substance abuse, which the department had made copious efforts to address."). Consequently, neither this court nor our legislature has crafted a finite list of factors that the trial court must consider on this issue or indicated which factors, if any, should be given greater weight than others when performing that analysis. Rather, our courts are instructed to look to the totality of the facts and circumstances presented in each individual case. See *In re Daniel C.*, supra, 63 Conn. App. 361–63. As a result, we are unable to conclude that any single factor must be considered, much less that it is determinative of the outcome, in every termination of parental rights proceeding.

This is not to say, however, that the trial court retains unbridled discretion in determining what factors to consider at the termination proceeding. Our Supreme Court has held that, after a hearing on the order of temporary custody pursuant to § 46b-129 (b), the trial court "shall order specific steps the commissioner and the parent or guardian shall take for the parent or guardian to regain or to retain custody of the child or youth . . . . In other words, the [department], through the specific steps issued by the court, is statutorily obligated to help the parent, if possible, regain custody of [the] child."[15] (Citations omitted, emphasis omitted; internal quotation marks omitted.) *In re Devon B.*, 264 Conn. 572, 581–82, 825 A.2d 127 (2003). On the basis of this language, we agree with the respondent, as a general matter, that the trial court's inquiry in a termination proceeding is guided by reference to any specific steps the trial court provided upon the issuance of an order of temporary custody. See General Statutes § 46b-129 (b) (2). Our case law, however, places a greater emphasis on what steps the *parent* was ordered to take and to what degree *the parent* complied with these steps. See *In re Shane M.*, 318 Conn. 569, 586–87, 122 A.3d 1247 (2015) ("When a child is taken into the commissioner's custody, a trial court must issue specific steps *to a parent* as to what should be done to facilitate reunification and prevent termination of parental rights. . . . [S]uccessful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation." [Citations omitted; emphasis added; internal quotation marks omitted.]); see also *In re Elvin G.*, supra, 310 Conn. 507–508 ("Specific steps provide notice and

guidance *to a parent* as to what should be done to facilitate reunification and prevent termination of rights. Their completion or noncompletion, however, does not guarantee any outcome. A parent may complete all of the specific steps and still be found to have failed to rehabilitate." [Emphasis added.]); cf. *In re Devon B.*, supra, 584 ("[W]e note that specific steps are considered to be '*fair warning' to a parent* of the potential termination of parental rights in subsequent proceedings. . . . Indeed, the failure to comply with specific steps ordered by the court typically weighs heavily in a termination proceeding." [Citation omitted; emphasis added.]). The language of these cases supports our interpretation that the court's emphasis during the termination proceeding, pursuant to § 17a-112 (j), is on the parent's willingness and ability to overcome the specific impediment preventing reunification and the department's efforts to help the parent achieve this goal; the court's emphasis is not on whether the department strictly complied with specific steps that logically do not materially advance the reunification of the parent and child. It is thus clear that not every specific step that the department is ordered to take upon the issuance of an order of temporary custody is ordered for the purpose of reunifying the parent and child. See *In re Christopher C.*, 134 Conn. App. 473, 479, 39 A.3d 1127 (2012) (noting that although respondent's participation in "Intensive Family Preservation [and the Reconnecting Families program] was . . . designed to facilitate successful reunification," respondent's court-ordered participation in Intensive Safety Planning Services "did not support reunification with Christopher").

After distilling our case law concerning the relationship between the department's efforts to reunify the parent with the child and the specific steps provided by the trial court at an earlier phase of the proceedings, we conclude that the specific steps that logically tend to promote and to materially advance the reunification of the parent and the child—and as a result, the services rendered by the department that logically facilitate reunification—are those steps and those corresponding efforts that are intended either to physically reunite the parent with the child or to assist the parent to overcome some hurdle that led to the initiation of the child protection proceedings. Thus, in determining whether the department made reasonable efforts to reunify the respondent with his daughter, the court was required to consider only those specific steps and efforts aimed at either of those two goals.

Because the investigation of proposed placement resources for the child does not logically promote either of those two goals, we conclude that the department was not obligated to prove that it satisfied this specific step by clear and convincing evidence, and consequently that the court was not obligated to consider the degree to which the department complied with this

specific step when it determined that the department made reasonable efforts to reunify the respondent with his daughter.[16]

Even if we were to assume that the investigation of relative resources has some bearing on the issue of whether the department made reasonable efforts to reunify a parent and a child, the respondent's argument would still fail because the applicable test for whether reasonable efforts were made is on the basis of the totality of the circumstances. See, e.g., *In re Ebony H.*, supra, 68 Conn. App. 349–50. "[The] completion or noncompletion [of the specific steps] . . . does not guarantee any outcome;" *In re Shane M.*, supra, 318 Conn. 587; and therefore, the department's failure to comply with *this* specific step is not dispositive as to the court's determination of whether, in light of all the facts and circumstances of the case, the department made reasonable efforts to reunify the parent and child.

Our case law further demonstrates that, even when the trial court finds notable deficiencies in the department's rendering of services that do relate directly to reunification, such a finding does not, by itself, "make the overall efforts of the department fall below the level of what is reasonable." *In re Alexander T.*, 81 Conn. App. 668, 673, 841 A.2d 274, cert. denied, 268 Conn. 924, 848 A.2d 472 (2004); see also *In re Ebony H.*, supra, 68 Conn. App. 350 (affirming judgment of trial court and holding that, "[n]otwithstanding the court's finding that the department's response to the respondent's request for assistance in obtaining housing was shameful and unacceptable, our review of the evidence . . . does not leave us with a definite and firm conviction that the court mistakenly found that the department had made reasonable efforts to reunify the respondent and the child"); *In re Charles A.*, 55 Conn. App. 293, 297, 738 A.2d 222 (1999) ("The court is aware that [the department] has made mistakes in this case . . . . These mistakes, however, do not defeat the proposition that reasonable efforts at reunification were made." [Internal quotation marks omitted.]). Accordingly, even if we were persuaded by the respondent's argument that the investigation of relative resources directly advances the reunification process, we would be compelled to conclude that the degree to which the department complied with that duty would be—at most—one factor among many that the trial court could consider. Cf. *In re Nevaeh W.*, 317 Conn. 723, 739–40, 120 A.3d 1177 (2015). Even then, the court would not have been, as the respondent proposes, required to attribute greater weight to this particular factor than to other relevant factors under its consideration.[17]

We conclude, therefore, that even if the investigation of relative resources were a factor to be considered by the court in assessing the reasonableness of the department's efforts to reunify a parent with his child,

a proven failure by the department to make such an investigation, either reasonably or at all, would not preclude the court from finding that the department had made a reasonable effort to reunify the parent with the child if the evidence otherwise supported that conclusion.[18] The respondent has not challenged the evidentiary basis upon which the trial court relied in determining that the department made reasonable efforts to reunify him with his daughter.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** February 17, 2017, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] In the same proceeding, the court also terminated the parental rights of Unique's mother, but she is not involved in this appeal. We therefore refer in this opinion to Samuel M. as the respondent.

[2] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . ."

[3] General Statutes § 17a-111b (a) provides: "The Commissioner of Children and Families shall make reasonable efforts to reunify a parent with a child unless the court (1) determines that such efforts are not required pursuant to subsection (b) of this section or subsection (j) of section 17a-112, or (2) has approved a permanency plan other than reunification pursuant to subsection (k) of section 46b-129."

[4] General Statutes § 17a-101g (e) provides: "If the Commissioner of Children and Families, or the commissioner's designee, has probable cause to believe that the child or any other child in the household is in imminent risk of physical harm from the child's surroundings and that immediate removal from such surroundings is necessary to ensure the child's safety, the commissioner, or the commissioner's designee, shall authorize any employee of the department or any law enforcement officer to remove the child and any other child similarly situated from such surroundings without the consent of the child's parent or guardian. The commissioner shall record in writing the reasons for such removal and include such record with the report of the investigation conducted under subsection (b) of this section."

[5] General Statutes § 46b-129 (b) provides in relevant part: "Upon issuance of an ex parte order, the court shall provide to the commissioner and the parent or guardian specific steps necessary for each to take to address the ex parte order for the parent or guardian to retain or regain custody of the child or youth . . . . "

[6] The respondent further was ordered to apprise the department of his whereabouts, to permit Unique's attorney or guardian ad litem to review her medical records, and to inform the department of any changes to the makeup of his household.

[7] The final specific steps provided to the respondent by the trial court on May 7, 2014, were identical to the preliminary steps provided to him upon the issuance of the ex parte order of temporary custody on January 27, 2014.

[8] Initially, Cory was pursued only as a placement resource for Jeramiah. By 2015, however, Cory had agreed to be "a placement and adoptive resource for Jeramiah and his sister Unique if they [became] free for adoption." As a result, the department's efforts in 2015 were focused on placing both children in Cory's custody.

[9] As noted in the trial court's memorandum of decision, an ongoing parent-child relationship is defined as "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child . . . ." General Statutes § 17a-

112 (j) (3) (D).

[10] Notably, the trial court did not discuss the department's efforts to place the children with their relatives in either the adjudicatory or dispositional portion of its memorandum of decision. Indeed, the only reference regarding the department's attempt to investigate the respondent's mother and sister is located in the factual background portion of the opinion.

[11] The respondent also argues that we should adopt his proposed interpretation of § 17a-112 (j) (1) because that interpretation would protect § 17a-112 (j) (1) from being challenged as a violation of a parent's substantive due process rights. The respondent does not allege, however, that the trial court violated his rights to substantive due process in this matter. Rather, the respondent argues that, unless his interpretation of "reasonable efforts to reunify" is adopted by this court, § 17a-112 (j) (1) may be challenged in the future on substantive due process grounds. Because he has not alleged a violation of his constitutional rights, we decline to address this claim. See *In re Brayden E.-H.*, 309 Conn. 642, 656, 72 A.3d 1083 (2013) ("With respect to the merits of this claim, we recognize the significance of the question presented. Nonetheless, as a jurisprudential matter, this court generally avoids an unnecessary determination of constitutional questions.").

[12] Pursuant to § 17a-112 (j) (3), the department must allege and substantiate the existence of one of the following statutory grounds for termination of parental rights: "(A) the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding, or (ii) is found to be neglected, abused or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; (C) the child has been denied . . . guidance or control necessary for the child's physical, educational, moral or emotional well-being . . . (D) there is no ongoing parent-child relationship, [see footnote 8] . . . (E) the parent of a child under the age of seven years who is neglected, abused or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families; (F) the parent has killed through deliberate, nonaccidental act another child of the parent . . . or (G) the parent committed an act that constitutes sexual assault . . . ." (Citations omitted.)

[13] "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights . . . exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Paul O.*, 141 Conn. App. 477, 483, 62 A.3d 637, cert. denied, 308 Conn. 933, 64 A.3d 332 (2013); see also *In re Victoria B.*, 79 Conn. App. 245, 261, 829 A.2d 855 (2003) (noting that, at the dispositional phase of a termination of parental rights hearing, "the emphasis appropriately shifts from the conduct of the parent to the best interest of the child" [internal quotation marks omitted]).

[14] In his reply brief to this court, the respondent suggests that the language of § 17a-111a (b) (1) demonstrates a legislative intent for the department to bear the burden of proving, pursuant to § 17a-112 (j) (1), that it conducted an adequate investigation into proposed placement resources for the child in its efforts to reunify the parent and the child. We are unpersuaded.

General Statutes § 17a-111a provides in relevant part: "(a) The Commissioner of Children and Families *shall file* a petition to terminate parental rights pursuant to section 17a-112 if (1) the child has been in the custody of the commissioner for at least fifteen consecutive months, or at least fifteen months during the twenty-two months, immediately preceding the filing of such petition . . . . (b) Notwithstanding the provisions of subsection (a) of this section, the commissioner is *not required* to file a petition

to terminate parental rights in such cases if the commissioner determines that: (1) The child has been placed under the care of a relative of such child . . . .'' (Emphasis added.)

Although subsection (a) requires that the petitioner file a petition to terminate parental rights in cases where the child has been in the department's custody for a substantial period of time, subsection (b) provides that the petitioner is *not required* to file a petition when the child has been placed with relatives. The phrase "not required" is discretionary language, however, and thus, even when the child has been placed with relatives, subsection (b) does not prevent the petitioner from filing a petition for termination of parental rights. Cf. *Waterbury* v. *Washington*, 260 Conn. 506, 531, 800 A.2d 1102 (2002) ("The word may, unless the context in which it is employed requires otherwise, ordinarily does not connote a command. Rather, the word generally imports permissive conduct and the conferral of discretion. . . . The use of the word shall in conjunction with the word may confirms that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings." [Citations omitted; internal quotation marks omitted.]). Therefore, the respondent's reliance on the plain language of § 17a-111a (b) is misplaced.

[15] The specific steps issued by the trial court are listed within Judicial Branch Form JD-JM-106. This form contains fourteen steps that the department must take in response to the order of temporary custody. Standard among those specific steps is an order for the department to conduct an "investigation and consideration of any person(s) whom the respondent has properly identified as a placement resource for the child(ren)." Specific Steps Form, Judicial Branch Form JD-JM-106, available at http://jud.ct.gov/webforms/forms/JM106.pdf.

[16] The respondent also cursorily argues that the investigation of relative resources logically facilitates the reunification process because, by placing a child with a suitable relative, the petitioner could have delayed pursuing the termination of his parental rights. The respondent argues, thus, that placing a child with relatives may have provided him with additional time to address his issues with mental health and substance abuse, and thereby reduced the probability that the petitioner would have pursued the termination of his parental rights. We disagree. Not only is the question of whether the respondent made sufficient efforts to address his substance abuse and mental health issues between 2013 and 2015 entirely unrelated to the question of whether the department adequately explored all of the available placement options for Unique, but our case law demonstrates that the department's ability to place a child with his or her relatives does not control the trial court's decision of whether it is appropriate to terminate a parent's parental rights. See *In re Denzel A.*, 53 Conn. App. 827, 834–35, 733 A.2d 298 (1999). In other words, the petitioner's ability to pursue the termination of parental rights is not contingent on whether the child has been placed with relatives. See *In re Tremaine C.*, 117 Conn. App. 590, 604, 980 A.2d 330, cert. denied, 294 Conn. 920, 984 A.2d 69 (2009). Moreover, it is axiomatic that "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence in custody cases." (Internal quotation marks omitted.) *In re Anthony H.*, 104 Conn. App. 744, 767, 936 A.2d 638 (2007), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008). To further delay the termination of the respondent's parental rights would have run counter to Unique's best interests, which have been paramount throughout these child protection proceedings.

[17] To grant the relief requested by the respondent, this court would be required either to attribute controlling weight to a specific factor under the trial court's consideration or to read § 17a-112(j) (1) as containing an implicit substantive element that the department must prove before a trial court could find that reasonable efforts to reunify had been made and that the court's failure to consider that factor in considering the department's efforts to reunify the respondent with his daughter is fatal to its decision.

We decline to attribute any specific weight to any factor relevant to the trial court's determination. The legislature created this multifactorial test, and thus for this court to attribute greater weight to any individual factor would overstep our role as the judiciary. It is well established that "the court may not, by construction, supply omissions in a statute or add exceptions or qualifications, merely because it opines that good reason exists for so doing. . . . In such a situation, the remedy lies not with the court but with the General Assembly." (Internal quotation marks omitted.) *In re Daniel N.*, supra, 163 Conn. App. 332.

We also decline to read § 17a-112 (j) (1) as containing an implicit substantive requirement that the petitioner must prove during the termination proceedings. We are reminded that "[t]his court cannot, by judicial construction, read into legislation provisions that clearly are not contained therein. . . ." (Internal quotation marks omitted.) *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 682, 911 A.2d 300 (2006). We decline, therefore, to read the plain language of § 17a-112(j) (1) as including an implicit substantive element, of which the department bears the burden of proving by clear and convincing evidence.

[18] Although the respondent did not raise a claim of insufficient evidence, we note that, on the basis of the record before the trial court, that court had sufficient evidence to find that the department made reasonable efforts to reunify the respondent with his daughter. With respect to the department's efforts to physically reunify the respondent with Unique, the record reveals that the respondent had no contact with Unique until he was released from prison, but by that time, she was already more than two years old. For the ten months following his release, the respondent had little interaction with Unique, after which time he contacted the department to arrange visitation with her. These visits were sporadic and were ultimately discontinued by the respondent.

Several months later, the respondent reapproached the department to arrange visits with Unique. Between February and November, 2014, the department scheduled thirty-nine weekly visits. The department also provided the respondent with bus fare to facilitate his visits with his daughter. The respondent, however, attended only eight of the thirty-nine scheduled visits. On November 16, 2014, the respondent was reincarcerated for failing to keep his probation officer informed as to his whereabouts. In March, 2015, the department resumed its attempts to arrange visits between Unique and the respondent. By this point, the respondent had been in prison for more than one half of Unique's life. Department worker Maria Nieves stated that, although Unique gradually became more comfortable and engaging with the respondent, there was little evidence to suggest that Unique recognized the respondent as anything more than a visitation resource.

With regard to the department's efforts to assist the respondent in overcoming his struggles with mental health and substance abuse issues, there was overwhelming evidence that the department made continuous efforts and referrals for treatment programs including, inter alia: a referral to the Southwest Mental Health System in Bridgeport, Connecticut; a referral to Connecticut Renaissance; a referral for inpatient therapy at Recovery Network Program; a referral to Crossroads Recovery; and a referral to Perception House for a nine month inpatient program.

On the basis of the foregoing evidence, the trial court had sufficient evidence to find that the department had made reasonable efforts to reunify the respondent and Unique prior to the filing of the petition to terminate his parental rights.