******************************************************************

The ''officially released'' date that appears near the beginning of this opinion is the date the opinion was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

This opinion is subject to revisions and editorial changes, not of a substantive nature, and corrections of a technical nature prior to publication in the Connecticut Law Journal.

******************************************************************

IN RE SKYLAR B.*
(AC 43916)

Lavine, Elgo and Palmer, Js.**

*Syllabus*

The respondent father appealed to this court from the judgment of the trial court terminating his parental rights as to his minor child, S. On appeal, the father claimed that the court deprived him of his right to substantive due process because transfer of guardianship to S's relative foster parents would have been a less restrictive means than termination of his parental rights to achieve permanency. *Held* that this court declined to review the respondent father's unpreserved constitutional claim because the record was inadequate for review under the first prong of *State* v. *Golding* (213 Conn. 233): the father failed to file a motion to modify disposition and/or transfer guardianship to the relative foster parents, and neither the trial court, the petitioner, the Commissioner of Children and Families, nor S and the proposed guardians, whose lives would have been most affected by whether the father's parental rights remained intact, were on notice at the outset of the trial on the termination of parental rights petition that the father would be arguing for an alternative disposition; only a proper motion filed by a respondent serves to provide the requisite notice to all interested parties and the court of such an alternative disposition and the evidence that is particularly relevant to a disposition of a transfer of guardianship, as opposed to a termination of parental rights and adoption.

Argued October 6, 2020—officially released May 17, 2021***

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of New Haven, Juvenile Matters, and tried to the court, *Marcus, J.*; judgment terminating the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed.*

*Albert J. Oneto IV*, assigned counsel, for the appellant (respondent father).

*Rosemarie T. Weber*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Benjamin Zivyon* and *Evan O'Roark*, assistant attorneys general, for the appellee (petitioner).

*David B. Rozwaski*, counsel for the minor child.

*Opinion*

ELGO, J. The respondent father, Jeffrey B., appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating his parental rights with respect to his minor child, Skylar B.,[1] on the ground that the respondent failed to rehabilitate in accordance with General Statutes § 17a-112 (j) (3) (B) (i).[2] On appeal, the respondent claims that the court deprived him of his right to substantive due process as guaranteed by the fourteenth amendment to the United States constitution because transfer of guardianship is a less restrictive means than termination of his parental rights to achieve permanency. We conclude that the record is inadequate to review the respondent's claim and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. Skylar was born in November, 2017, and is the child of Easter M. (mother) and the respondent. The Department of Children and Families (department) had a long history of involvement with both parents due to the mother's mental health issues and extensive use of illicit substances, as well as the respondent's extensive involvement in the criminal justice system and history of intimate partner violence with the mother.[3] At the time of Skylar's birth, a referral was made by a hospital social worker to the department because both Skylar and her mother tested positive for opiates.[4] In the referral, the social worker also reported that the mother had been hospitalized in June, 2017, after being assaulted by the respondent while she was pregnant with Skylar.

On November 20, 2017, the department executed a ninety-six hour hold on Skylar and eventually placed her with the relative foster home of her maternal aunt and uncle. In the course of their investigation, the department eventually located the respondent, who at that time was incarcerated at the New Haven Correctional Center (facility). On November 22, 2017, the department filed an ex parte motion for an order of temporary custody, which the court granted. The order was sustained by agreement on December 1, 2017. On January 16, 2018, the court adjudicated Skylar neglected and committed her to the care and custody of the petitioner. The respondent was present and represented by counsel at the above hearings and was provided specific steps to facilitate reunification, which were duly approved and ordered by the court.

The respondent was released from the facility in June, 2018, but he failed to keep in contact with the department. In July, 2018, the respondent informed the department that he was serving parole in New York and he indicated his intention to have his parole transferred to Connecticut to be closer to Skylar and her mother.

Although the department found service providers for the respondent in New York, the respondent declined to use them. The respondent also refused monthly visitation with Skylar, claiming that he did not want his daughter to see him while he was living in a hotel. In September, 2018, the respondent successfully transferred his parole from New York to Connecticut. The department referred the respondent to services for visitation, as well as substance abuse, intimate partner violence treatment, and parenting services.

Unbeknownst to the department, a no contact order was in place in connection with the respondent's parole, which prohibited him from contacting the mother. Despite that order, the respondent asked the department to arrange a joint visit with himself, the mother, and Skylar. A visit occurred in September, 2018, which led to the respondent's arrest for violating the conditions of his parole. The petitioner subsequently remained incarcerated until November, 2018. As a result, the services that the respondent was required to complete were placed on hold until his release.

On November 19, 2018, the petitioner filed a petition for termination of the respondent's parental rights, alleging that the respondent failed to achieve a sufficient degree of rehabilitation in accordance with § 17a-112 (j) (3) (B) (i)[5] and that he had no ongoing parent-child relationship with Skylar. See General Statutes § 17a-112 (j) (3) (D).[6] While that termination proceeding was pending, the respondent was arrested on federal charges stemming from gang related activities in New Haven.

A two day trial was held on the petition for termination of the respondent's parental rights, at which the respondent, who remained in federal custody, participated via video conference. On December 30, 2019, the court issued a memorandum of decision, in which it terminated the parental rights of the respondent.[7] In its findings of fact, the court relied heavily on an evaluation of the respondent conducted on March 28, 2019, by a court-appointed psychologist, Jessica Biren Caverly.[8] In her report, Caverly noted: "There are a number of concerns about the negative aspects of [the respondent's] history, including his significant legal history, arrests for substances that he denied using, and his minimization of intimate partner violence. These factors can be indicative of a personality disorder such as [a]ntisocial [p]ersonality [d]isorder or [n]arcissistic [p]ersonality [d]isorder. . . . In regard to substances, [the respondent's] recent urine tests [were] clean of all substances, but it is highly likely he is abstaining from substances solely so he can complete his parole." (Internal quotation marks omitted.) Caverly was particularly troubled by his blatant violation of parole orders requiring no contact with the mother, reporting that the respondent telephoned the mother during her own eval-

uation with Caverly. The court noted in its memorandum of decision that "[t]his is indicative of [the respondent's] failure to change his behavior even on a minimal basis." The court also found that "[i]t is apparent from the description . . . of the father-child [interaction] that the [respondent] presently is unable to meet Skylar's needs." In light of the foregoing, the court found by clear and convincing evidence that the respondent failed to rehabilitate pursuant to § 17a-112 (j) (3) (B) (i).[9]

Having found an adjudicatory ground for termination, the court turned to the dispositional phase of its ruling. The court determined by clear and convincing evidence that termination of the respondent's parental rights was in Skylar's best interest, and expressly considered the factors outlined in § 17a-112 (k).[10] In so doing, the court emphasized the respondent's failure to benefit from services that were timely offered to him and the fact that there was insufficient time for Skylar to develop a relationship with the respondent due to his incarceration following parole. The court, pursuant to § 17a-112 (k), also considered Skylar's emotional ties with her maternal aunt and uncle, in whose physical care and custody she has remained since birth. To that end, the court credited Caverly's testimony that Skylar was "well bonded to her foster parents . . . and . . . looked to them for support," observing that they were her psychological parents and that their home was the only home she has ever known. Finally, the court found that the foster family had committed to being an adoptive resource for Skylar. The court thus found, by clear and convincing evidence, that it was in Skylar's best interest to have the respondent's parental rights terminated, and appointed the petitioner as Skylar's statutory parent. This appeal followed.

On appeal, the respondent generally does not challenge the trial court's factual findings and conclusions of law with respect to its determination that he failed to achieve a sufficient degree of personal rehabilitation pursuant to § 17a-112 (j) (3) (B) (i).[11] Rather, he claims that the court deprived him of his right to substantive due process, as guaranteed by the fourteenth amendment to the United States constitution, because the petitioner "was without a compelling reason to terminate his parental rights" given that Skylar was placed with relative foster parents "within the meaning of [General Statutes] § 17a-111a (b) (1)."[12] The respondent contends that, in light of Skylar's placement with relative foster parents, the petitioner "improperly allowed the relatives to select a permanency plan for the child calling for a termination of the respondent's parental rights, instead of using [her] authority under the statute to effectuate a transfer of guardianship to the relatives as a less restrictive means of permanency . . . ."

The respondent's counsel conceded at oral argument before this court that §§ 17a-111a and 17a-112 do not

contain such "least restrictive means" language. Instead, the respondent relies primarily on footnote 11 of *In re Unique R.*, 170 Conn. App, 833, 845 n.11, 156 A.3d 1 (2017), and on *In re Azareon Y.*, 309 Conn. 626, 634–37, 72 A.3d 1074 (2013), to support his claim that § 17a-111a "must be interpreted to preclude the petitioner from filing [petitions] to terminate parental rights under § 17a-112 if the child's health and safety can be protected by transferring guardianship of the child to a relative as a less restrictive means of permanency." This, the respondent claims, is the only way "to save [§§ 17a-111a and 17a-112] from constitutional infirmity . . . ."[13] The respondent acknowledges that he did not raise this issue before the trial court and, thus, seeks review of this unpreserved constitutional claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

In *Golding*, our Supreme Court held that "a [respondent] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 781. "[T]he inability to meet any one prong requires a determination that the [respondent's] claim must fail. . . . The appellate tribunal is free, therefore, to respond to the [respondent's] claim by focusing on whichever condition is most relevant in the particular circumstances." (Citation omitted; internal quotation marks omitted.) *State* v. *Soto*, 175 Conn. App. 739, 755, 168 A.3d 605, cert. denied, 327 Conn. 970, 173 A.3d 953 (2017).

"In assessing whether the first prong of *Golding* has been satisfied, it is well recognized that [t]he [respondent] bears the responsibility for providing a record that is adequate for review of [his] claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the [respondent's] claim. . . . The reason for this requirement demands no great elaboration: in the absence of a sufficient record, there is no way to know whether a violation of constitutional magnitude in fact has occurred." (Citations omitted; internal quotation marks omitted.) *In re Anthony L.*, 194 Conn. App. 111, 114–15, 219 A.3d 979 (2019), cert. denied, 334 Conn. 914, 221 A.3d 447 (2020).

In *In re Azareon Y.*, supra, 309 Conn. 632, the respondent sought *Golding* review of her unpreserved claim that substantive due process required the court to determine that the permanency plan of termination of the respondent's parental rights was the least restrictive means to ensure the state's compelling interest in protecting the child's best interests. In determining that the record was inadequate for review under *Golding*'s first prong, our Supreme Court observed that the respondent did not request that the trial court consider any alternatives to the petitioner's permanency plan, the court's memorandum of decision did not indicate whether it had considered a permanency plan other than the one advocated by the petitioner, and the respondent did not ask the court to articulate whether it had considered other options. Id., 632–33. Because "the petitioner was never put on notice of the respondent's proposed constitutional gloss to § 17a-112," the court concluded that "it [would have been] manifestly unfair to the petitioner . . . to reach the merits of the respondent's claim . . . ." (Internal quotation marks omitted.) Id., 638; see also *In re Madison C.*, 201 Conn. App. 184, 193, 241 A.3d 756, cert. denied, 335 Conn. 985, 242 A.3d 480 (2020); *In re Anthony L.*, supra, 194 Conn. App. 112–13.

In the present case, the respondent claims that his right to substantive due process was violated by the termination of his parental rights because transfer of guardianship to the relative foster parents would have been a less restrictive means of achieving permanency for Skylar.[14] The respondent does not dispute the fact that he did not file a motion before the court seeking a transfer of guardianship to the relative foster parents. He nevertheless contends that the record is adequate for review under the first prong of *Golding* because, at trial, his counsel argued during closing arguments that the court should transfer guardianship to the relative foster parents instead of terminating his parental rights. The respondent further asserts that "[i]t is certain from the record . . . that Skylar's relatives would have kept her in their care under any arrangement that did not result in Skylar being given back [to her parents] and taken away again" and suggests that the mere fact that they told the petitioner that they "preferred" an adoption does not mean that they opposed a transfer of guardianship. (Internal quotation marks omitted.) Because the respondent failed to file a motion to modify disposition and/or to transfer guardianship to the relative foster parents pursuant to General Statutes § 46b-129 (j) and Practice Book § 35a-16 or § 35a-12A, we do not agree that there is an adequate record for review.

Our Supreme Court's decisions in *In re Azareon Y.*, supra, 309 Conn. 626, and *In re Brayden E.-H.*, 309 Conn. 642, 72 A.3d 1083 (2013), which were both released on July 30, 2013, are instructive. In *In re Azar-*

*eon Y.*, the court concluded there was an inadequate record to review the respondent's substantive due process claim and specifically noted the absence of critical factual findings in the record to support the claim that viable alternatives to termination and adoption existed. *In re Azareon Y.*, supra, 637. By contrast, the court in *In re Brayden E.-H.* reached the merits of a similar substantive due process claim because the trial court had made specific findings regarding the dispositional alternatives to termination sought by the respondent parents. *In re Brayden E.-H.*, supra, 651, 655–56. In that case, the trial court, in determining whether to terminate the parental rights of both parents, was presented with the respondent father's motion to transfer permanent guardianship to the paternal great-aunt and her husband, as well as the respondent mother's motion to transfer guardianship. Id., 650. The trial court ultimately terminated the respondent mother's parental rights, but it denied the petition to terminate the respondent father's parental rights and granted the father's motion to transfer permanent guardianship to the paternal relatives. Id., 644, 653. On appeal, the respondent mother argued that the trial court violated her right to substantive due process because termination was not required given that the court had granted permanent guardianship to the paternal relatives. Id., 644–45. Our Supreme Court concluded that it was unnecessary to decide whether substantive due process requires that a court determine whether termination is the least restrictive means to protect a child's best interest and, instead, held that, even if substantive due process required such a determination, the trial court's decision in that case satisfied that standard. Id., 645.

In so concluding, the court relied heavily on the findings of fact made by the trial court pursuant to the relevant statutory scheme, including the termination of parental rights provisions and the relevant transfer of guardianship provisions of § 46b-129 (j) (6) and Practice Book § 35a-20, as asserted by the father and the respondent mother relevant to their respective motions. Id., 648–51. Our Supreme Court emphasized the court's findings with respect to the respondent's relationship with the proposed guardian, including its conclusion that the it would be impossible for the proposed guardian to accommodate the respondent, that the respondent was "confrontational, unpredictable and aggressive," and that the respondent "would . . . [take] every possible opportunity to undermine and destabilize [the proposed guardian's] position as principal caretaker by filing motions for reinstatement of guardianship." (Internal quotation marks omitted.) Id., 659. The court also underscored the trial court's finding that "[t]he children could never confidently attach and would be tormented by divided loyalties." (Internal quotation marks omitted.) Id. It further emphasized the trial court's observation that "*giving [the respondent*

*mother*] *any opportunity to further litigate would be disastrous to the children and to the guardians.* As it is now, the statute does not address specifically visitation and thus could provide her with an opportunity to litigate. *That possibility does not exist if her parental rights are terminated. The intention of the court was to prevent her from having any further control or influence over the children, including visitation, during which time she could undermine the authority of the guardians.*" (Emphasis in original.) Id., 661. Our Supreme Court noted the trial court's conclusion that "*any* avenue that would permit the respondent to exert *any* further control or influence over the children would undermine the guardians' relationship with the children and would be contrary to the children's best interests." (Emphasis in original.) Id., 661–62. "Finally, the fact that the court declined to terminate [the father's parental] rights but determined that termination of the respondent's rights was necessary reflects the court's conclusion that nothing short of terminating the respondent's rights would adequately protect the children's best interests."[15] Id., 662.

Although the findings made by the trial court in *In re Brayden E.-H.* are specific to that case, the trial court's application of the established best interest standard to the relevant motions in that case resulted in a record that the Supreme Court could review for purposes of the respondent's substantive due process claim. That record, to the extent that permanent guardianship was sought, required factual findings and a determination that "[a]doption of the child or youth is not possible or appropriate" pursuant to what is now § 46b-129 (j) (6) (B). See id., 652. Moreover, because of the juxtaposition of both termination of parental rights petitions and the motions to transfer guardianship, the trial court in that case was required to evaluate a variety of considerations which, while not exclusive to motions for transfer of guardianship—such as the ability to attach, divided loyalties, undermining the authority of proposed guardian or caretaker, and the ability to use the legal system to exert control or influence over a child—have heightened importance when evaluating whether guardianship affords the child sufficient security and permanency when a parent, for whom adjudicatory grounds have been found, nevertheless, seeks to retain his parental rights.

In the present case, by contrast, neither the trial court, the petitioner, nor the minor child and the proposed guardians, whose lives would be most affected by whether the respondent's parental rights remain intact, were on notice at the outset of the trial that the respondent would be arguing for an alternative disposition. Only a proper motion filed by a respondent serves to provide the requisite notice to all interested parties and the court of such an alternative disposition and the evidence that is particularly relevant to a disposition

of a transfer of guardianship, as opposed to a termination of parental rights and adoption. See, e.g., *In re Azareon Y.*, supra, 309 Conn. 641 (lack of evidence as to whether maternal aunt would have agreed to long-term foster care or conventional guardianship).

As this court repeatedly has observed, "[o]ur role is not to guess at possibilities, but to review claims based on a complete factual record developed by the trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the respondent's claims] would be entirely speculative." (Internal quotation marks omitted.) *In re Madison C.*, supra, 201 Conn. App. 196. Because the respondent has failed to provide this court with an adequate record for review, his claim fails *Golding*'s first prong. We, therefore, decline to review the merits of the respondent's claim.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

*** May 17, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The attorney for the minor child has filed a statement, pursuant to Practice Book §§ 67-13 and 79a-6 (c), adopting the brief of the Commissioner of Children and Families.

[2] The court also terminated the parental rights of Skylar's mother, Easter M., in the same proceeding on the same grounds. Skylar's mother did not appeal from this judgment, and, therefore, we refer to Jeffrey B. as the respondent in this opinion.

[3] As the court noted in its memorandum of decision, in 2011, the Probate Court transferred guardianship of another child of the mother and the respondent to a maternal great-aunt.

[4] Skylar's mother tested positive for opiates on November 7, 2017, and later in November, 2017, on the date of Skylar's birth.

[5] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused, or uncared for in a prior proceeding . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[6] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (3) . . . (D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . ."

[7] The court also terminated the parental rights of Skylar's mother.

[8] Caverly's parenting/psychological evaluation report was admitted into evidence as state's exhibit D.

[9] In light of that determination, the court declined to address the department's alternative statutory ground for termination pursuant to § 17a-112 (j) (3) (D).

[10] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[11] The respondent does allege, in a footnote in his principal appellate brief, that one of the trial court's factual findings in the dispositional phase was clearly erroneous—namely, that there was insufficient time for Skylar to develop a relationship with him under § 17a-112 (k) (4). That claim is without merit. "A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Keyashia C.*, 120 Conn. App. 452, 455, 991 A.2d 1113, cert. denied, 297 Conn. 909, 995 A.2d 637 (2010).

In the present case, the court concluded that the time that the respondent spent with Skylar was insufficient because the respondent "only began visitation with Skylar in November, 2018, and was incarcerated in July, 2019, on his federal charges." The respondent argues that this conclusion was clearly erroneous because, between his return from parole in New York in September, 2018, and his subsequent incarceration on federal charges in July, 2019, he consistently visited with Skylar for weekly one hour visits for more than ten months. However, during this visitation period, the respondent was arrested in September, 2018, and incarcerated until November, 2018, for violating a no contact order with Skylar's mother. Although the court acknowledged that there were visits subsequent to his November, 2018 incarceration, it found at the time of trial that "he is now incarcerated again for a lengthy period of time and is no longer available to her." Moreover, the court's finding that there was insufficient time for Skylar to bond with the respondent is supported by the expert testimony of Caverly. According to Caverly, at the time of her evaluation, the respondent "ha[d] only recently begun visitation and therefore their relationship [was] new and likely [did] not have any positive memories." In light of that evidence, the court's finding was not clearly erroneous.

[12] General Statutes § 17a-111a provides: "(a) The Commissioner of Children and Families shall file a petition to terminate parental rights pursuant to section 17a-112 if (1) the child has been in the custody of the commissioner for at least fifteen consecutive months, or at least fifteen months during the twenty-two months, immediately preceding the filing of such petition; (2) the child has been abandoned as defined in subsection (j) of section 17a-112; or (3) a court of competent jurisdiction has found that (A) the parent has killed, through deliberate, nonaccidental act, a sibling of the child or has requested, commanded, importuned, attempted, conspired or

solicited to commit the killing of the child or a sibling of the child; or (B) the parent has assaulted the child or a sibling of a child, through deliberate, nonaccidental act, and such assault resulted in serious bodily injury to such child.

"(b) Notwithstanding the provisions of subsection (a) of this section, the commissioner is not required to file a petition to terminate parental rights in such cases if the commissioner determines that: (1) The child has been placed under the care of a relative of such child; (2) there is a compelling reason to believe that filing such petition is not in the best interests of the child; or (3) the parent has not been offered the services contained in the permanency plan to reunify the parent with the child or such services were not available, unless a court has determined that efforts to reunify the parent with the child are not required."

[13] Neither *In re Unique R.*, supra, 170 Conn. App. 833, nor *In re Azareon Y.*, supra, 309 Conn. 626, supports the respondent's claim that § 17a-111a precludes the filing of a termination petition if there is a less restrictive means of permanency. Indeed, far from supporting the respondent's contentions, a careful review of *In re Unique R.* suggests a contrary conclusion. In that case, this court concluded that the trial court did not improperly terminate the respondent's parental rights due to the petitioner's alleged failure to conduct an adequate investigation of his relatives as placement resources. See *In re Unique R.*, supra, 835–36. Specifically, we held that reasonable efforts to reunify the respondent with his child pursuant to § 17a-112 (j) (1) did not require investigation and placement with relative resources. Id., 844–45. Notably, in footnote 14 of that opinion, we compared § 17a-111a (a), which *requires* the petitioner to file a termination of parental rights petition when a child has been in the custody of the petitioner for a substantial period of time, with § 17a-111a (b), which, when a child is placed with relatives, does *not require* the filing of a termination petition. Id., 853–54 n.14. Observing that "[t]he use of the word shall in conjunction with the word may confirms that the legislature acted with complete awareness of their different meanings," we concluded that the phrase "not required" is discretionary language and, therefore, even when a child has been placed with relatives, § 17a-111a (b) does not prevent the petitioner from filing a termination petition. (Internal quotation marks omitted). Id. In contrast, footnote 11 references the respondent's substantive due process claim relative to the reasonable efforts requirement of § 17a-112 (j) (1), which is not the provision implicated in the present case. Id., 845 n.11.

Although the respondent does not direct us to authority for his specific claim that the petitioner must have "a compelling reason to terminate his parental rights" when a child is placed with relatives, we note that the plain language of § 17a-111a (b) (2) requires the petitioner to provide a compelling reason when she does not file a termination of parental rights petition within the statutory guidelines.

[14] The genesis and application of the "less or least restrictive means of permanency" concept is unclear in our jurisprudence, such that our courts have noted confusion in how these claims have been presented on appeal. See, e.g., *In re Azareon Y.*, supra, 309 Conn. 637 (noting various ways in which claim was framed on appeal); *In re Adelina A.*, 169 Conn. App. 111, 120, 148 A.3d 621 (court compelled to clarify various usages of term), cert. denied, 323 Conn. 949, 169 A.3d 792 (2016). Nevertheless, the consistent and express purpose of the various iterations of the concept has been to challenge what we have previously acknowledged is the legislative preference for termination and adoption.

In *In re Adelina A.*, we observed that "[t]he Adoption and Safe Families Act (ASFA), Pub. L. No. 105-89, 111 Stat. 2115 (1997), and parallel state law, has established a clear preference for termination followed by adoption when reunification with a parent is not a viable permanency plan. . . . ASFA also requires the petitioner to file a petition for termination of parental rights if the child has been under the responsibility of the state for fifteen of the last twenty-two months, subject to limited exceptions. 42 U.S.C. § 675 (5) (E) (2012); see 45 C.F.R. § 1356.21 (i); see also General Statutes § 17a-111a (a). Finally, state law requires a court to find by clear and convincing evidence that adoption is not possible or appropriate prior to issuing an order for permanent legal guardianship. General Statutes § 46b-129 (j) (6) (B)." (Citations omitted.) *In re Adelina A.*, supra, 121 n.14. Such efforts are consistent with federal law which, pursuant to 42 U.S.C. § 675 (1) (F) (v) (2018), requires that child protection agencies document that they have advised prospective guardians that adoption is the more permanent alternative to legal guardianship.

We further note that the concept of "least or less restrictive alternative to permanency" espoused by the respondent should be distinguished from the phrase "least restrictive placement," which is an established term of art governing placement of a child while in foster care, and which specifically emanates from the federal Adoption Assistance and Child Welfare Act of 1980, Pub. L. 96–272, 94 Stat. 500, as amended by the Adoption and Safe Families Act of 1997, Pub. L. No. 105–89, 111 Stat. 2115. See 42 U.S.C. § 671 et seq. (2018). Pursuant to federal funding requirements, state and local child protection agencies are required to develop a "case review system" for each child placed in foster care; 42 U.S.C. § 671 (A) (16) (2018); to assure, inter alia, that "each child has a case plan designed to achieve placement in a safe setting that is the *least restrictive (most family like)* and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child . . . ." (Emphasis added.) 42 U.S.C. § 675 (5) (A) (2018).

[15] Our Supreme Court also emphasized the trial court's finding, made pursuant to what is now § 46b-129 (j) (6) (B), that, because the proposed guardians were in their sixties and had chronic health issues, they were not an appropriate adoptive placement, notwithstanding their willingness to adopt the child. Id., 652.